IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 3, 2021 Session

## STATE OF TENNESSEE v. TONY THOMAS and LARONDA TURNER

**Appeal from the Criminal Court for Shelby County
Nos. C17-00608, C17-00609, & 17-00382   J. Robert Carter, Jr., Judge**

_____

### No. W2019-01202-CCA-R3-CD

_____

The Defendants, Tony Thomas and Laronda Turner, were convicted of three counts of first-degree premeditated murder and received life sentences on each count. On appeal, they raise the following issues: (1) whether the evidence was sufficient to support their convictions, specifically whether the co-defendant's testimony was reliable and sufficiently corroborated; (2) whether the trial court erred by denying the Defendants' motion to dismiss the indictment due to the State's Ferguson violation by failing to preserve the photographic lineups shown to the witnesses and the co-defendant's cell phone taken upon his arrest; (3) whether the trial court erred by not granting a new trial because the State committed a Brady violation by failing to disclose all inconsistent statements made by the co-defendant during proffer sessions; (4) whether the trial court committed error when it sua sponte prohibited the introduction of the printout of the co-defendant's message to his girlfriend implicating himself in the murders, and in so doing, made an improper comment on the evidence; and (5) whether the trial court erred in instructing the jury by including the language "or either of them" throughout the jury instructions.[1] Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which and J. ROSS DYER, J., joined. CAMILLE R. MCMULLEN, J., filed a dissenting opinion.

Harry E. Sayle III (on appeal), Memphis, Tennessee; Phyllis L. Aluko (of counsel), District Public Defender[2]; and Jennifer H. Case and Samuel Christian (at trial), Assistant District Public Defenders, for the appellant, Tony Thomas.

---

[1] For the sake of clarity, we have re-ordered the issues as presented by the Defendants in their appellate briefs.

[2] Stephen C. Bush was the District Public Defender at the time of the Defendants' trial. Ms. Aluko replaced Mr. Bush in 2019.

Josie S. Holland (on appeal), and John R. Scott (at trial and on appeal), Memphis, Tennessee, for the appellant, Laronda Turner.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Hagerman and Austin B. Scofield, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case arises from the shooting deaths of Anthony Isom, Michael Glover, and Chastity Springfield that occurred inside Anthony's[3] residence on Lake Grove Street in Memphis between the hours of 1:00 and 2:00 a.m. on September 26, 2015. Thereafter, on January 26, 2017, a Shelby County grand jury indicted Defendants Thomas and Turner, along with co-defendant Demarco Hawkins, for three counts of first-degree premeditated murder in relation to these deaths. See Tenn. Code Ann. § 39-13-202. Co-defendant Hawkins's case was severed from the Defendants, and they proceeded to a joint trial in May 2019.

A. State's proof. Terry Jennings testified that he lived on Lake Grove Street in September 2015 next door to Anthony's duplex. Mr. Jennings testified that early in the morning on September 26, 2015, he heard a knock on his front door, so he got out of bed. While he was sitting on his couch, he heard people talking next door. Mr. Jennings said that he heard someone say, "Don't shoot me," and that he then heard a different individual say, "You done [sic] messed up." After these statements, Mr. Jennings heard "[a] lot of shooting" from what sounded like an automatic weapon. He also heard a woman scream. When he looked out his living room window, he saw two Black men walking away from the duplex—one trailing about five feet behind the other. Mr. Jennings described the first man as shorter, dark-skinned, "a lot of hair on his head," and shirtless, and the second man as approximately six feet tall with light skin. Mr. Jennings stated that he did not observe any tattoos on the dark-skinned man and that he had seen the dark-skinned man at the residence previously. According to Mr. Jennings, the two men got into a "big" burgundy vehicle, which was parked across the street from Anthony's residence, and the car proceeded toward Chelsea Avenue, where it went out of Mr. Jennings's sight.

After the vehicle left, Mr. Jennings immediately called 911. During the 911 call, which was placed at 1:31 a.m., Mr. Jennings stated that he heard "a whole lot of shooting" coming from a pistol, approximately fifteen gunshots total, from the residence next door.

---

[3] Because Anthony Isom shares the same last name with several witnesses, we will refer to members of the Isom family by their first names for purposes of clarity. We intend no disrespect in so doing.

- 2 -

Mr. Jennings informed the 911 operator that he did not recognize anyone but that he saw two Black men leaving the residence. Mr. Jennings further informed that he saw the men leave the house and get inside a four-door maroon-colored vehicle, but that he did not see which direction they went.

Memphis Police Department ("MPD") Detective Nick Dandridge responded to Anthony's residence to investigate, which was the left side of the duplex. According to Detective Dandridge, officers were unable to enter through the front door because it was blocked by Anthony's body. After entering the residence through a side door, Detective Dandridge observed Anthony's body lying between the front door and the bed in the front room, Ms. Springfield's body "hanging out" of the rear-bedroom window, and Mr. Glover's body lying in a closet in the rear bedroom. All three had been shot multiple times, and there were shell casings throughout the house. Also, Anthony's pants had been pulled down below his hips.

Detective Dandridge also found broken glass and baggies of marijuana across the street from Anthony's house where the suspect car had been parked. When shown a photograph of keys hanging on the inside of Anthony's security door, Detective Dandridge opined that Anthony kept the keys in the door with the door locked and only let inside people he knew. Detective Dandridge acknowledged that no fingerprints or DNA evidence were found at the crime scene.

In addition, Detective Dandridge discovered a green notebook inside the residence and a writing on the wall "that said rest in peace Ralph" dated September 2, 2015. He described the notebook's contents for the jury, which included a list of names of who was present on a certain date. Detective Dandridge opined that the notebook contained recordings of gang activity.

After assessing the crime scene, Detective Dandridge spoke with Mr. Jennings, and Mr. Jennings went to the police station and gave a formal statement. In that statement, Mr. Jennings described the "second guy" as being five feet, nine inches tall.

Though Mr. Jennings could not remember an exact number, Mr. Jennings confirmed that he was shown more than one photographic lineup of male suspects and that he was unable to make any identification from the lineups. Mr. Jennings said that he "got a good enough look at the men as they left the house" and that he would have been able to recognize them if the photograph appeared in the lineup. Mr. Jennings explained that he saw the men's side profiles from the light of a street lamp. Mr. Jennings indicated that he did not see anyone other than the two men inside the car that night and confirmed that he never saw a woman. Mr. Jennings also testified that the police told him that the car was burgundy when he kept describing it as red.

Detective Dandridge confirmed that Mr. Jennings was shown lineups labeled A and B and that Defendant Thomas's picture was included in a photographic lineup A. Photographic lineups labeled A and B were admitted into evidence. Lineup B did not include a photograph of either of the two male defendants, and the names of the individuals shown in the photographs were apparent from the copy entered into evidence. Detective Dandridge testified that when Mr. Jennings viewed the lineup containing Defendant Thomas's photograph, Mr. Jennings was unable to identify anyone and that he explained it was too dark and "only saw silhouettes" of the men while they were running. Detective Dandridge reviewed Mr. Jennings's police statement and affirmed that it appeared from the statement that Mr. Jennings was only shown the two photographic lineups. Detective Dandridge could not recall if anyone ever spoke to Mr. Jennings again during the investigation.

Shortly after the killings, Detective Dandridge learned that the Louie & Sue Supermarket across Chelsea Avenue had a security camera that "point[ed] directly" at the area of Lake Grove Street where Anthony lived. The jury was shown the surveillance recording. However, the recording was from a relatively far distance away; the angle, in addition to crossing the street, crossed a "long[] and broad" vacant field lot before showing a residence at the end of Lake Grove Street. Anthony's residence was next door to the residence at the end of the street; Anthony's duplex was not visible from the camera's angle. In addition, the events occurred at nighttime, so the recording provided only a dark view of the area. The video depicted that around 10:30 p.m., a vehicle arrived and parked on Lake Grove Street across the street from Anthony's residence. At that time, there appeared to be "some movement in the car" when the vehicle's doors opened and closed. After the initial movement, no additional movement occurred inside or around the vehicle until shortly after 1:30 a.m. After the individuals appeared to get inside the car, the car was driven away from the residence at approximately 1:33 a.m. It turned left off of Lake Grove Street onto Chelsea Avenue and passed directly in front of the store.

Detective Dandridge testified that the car in the video was "a maroon, larger car, older model" with "a silver streak go[ing] down the side of the car." During the days immediately following the homicides, police learned that Defendants Thomas and Turner owned a similar car, which Detective Dandridge initially agreed was a 1997 "red, maroon," Mercury Grand Marquis. According to Detective Dandridge, the Defendants were brought in for questioning on September 28, 2015. At that time, Defendant Thomas was shown a still-shot photograph from the video depicting the car. Defendant Thomas confirmed that he recognized the car and wrote the words, "This is our car," on the still-shot. Defendant Turner also viewed the still-shot photograph of the vehicle from the surveillance recording and identified it as her vehicle, writing, "This is my car. I have the same car." Upon a subsequent search of the Defendants' vehicle, police discovered "some blue latex gloves" inside; no other incriminating evidence was found therein. Photographs of the Defendants'

red vehicle, which showed a silver stripe going down the side of the car, were entered into evidence.

On cross-examination, Detective Dandridge compared the crime scene notes from 2015 with a sticker of the VIN number for the Defendants' vehicle, and after doing so, he confirmed that the Defendants' car was a 2000 Ford Crown Victoria, not a 1997 Grand Marquis. Detective Dandridge explained that he could not recall the exact make and model of the car due to the passage of time and merely agreed with the prosecutor on direct examination.

Detective Dandridge agreed that "several guns" were found inside Anthony's residence. Detective Dandridge also identified a photograph of a utility bill in the name of James Brannon that was found at Anthony's residence. According to Detective Dandridge, Mr. Brannon was cleared as suspect.

Dr. Marco Ross, the acting medical examiner, performed autopsies on the three victims. Dr. Ross testified that Anthony suffered fourteen gunshot wounds to the head, torso, and right buttock, as well as one graze gunshot wound to his shoulder. Dr. Ross further testified that the gunshots caused damage to Anthony's brain, kidney, liver, and intestine. Dr. Ross opined that based upon the presence of stippling around the gunshot to Anthony's left upper back area, the distance of the handgun was up to three to four feet away from Anthony when that shot was fired. As for Mr. Glover, Dr. Ross said that he suffered multiple gunshot wounds to his left eyebrow region, neck, right shoulder, back, hip, and right buttock, as well as additional graze wounds to his abdomen and back. Dr. Ross testified to a variety of internal damage caused by Mr. Glover's gunshot wounds and opined that based upon his observations, some of the gunshot wounds had a downward trajectory. Finally, as for Ms. Springfield, Dr. Ross stated that she sustained three gunshot wounds to the left side of her face, underneath her chin, and on the right wrist. Ms. Springfield suffered damage to her brain from the gunshot wound to the face, and there was stippling present on both head wounds. Dr. Ross opined that the manner of death for all three victims was homicide.

Detective Dandridge testified that in the months following the murders, co-defendant Hawkins, aka "D Money," became a suspect in the investigation because he was bragging on Facebook about killing Anthony. On November 23, 2015, the police spoke with Jasmine Dorris, a woman whom co-defendant Hawkins had been messaging on Facebook, and she provided identifying information for co-defendant Hawkins to the police. Ms. Dorris showed Detective Dandridge messages from co-defendant Hawkins wherein he implicated himself in Anthony's murder, and the police made copies of those messages. Detective Dandridge confirmed that, thereafter, the police requested co-defendant Hawkins's cell phone records from AT&T.

Co-defendant Hawkins was arrested at his workplace at approximately 3:00 p.m. on May 10, 2016. When asked about the delay between November 2015 and May 2016, Detective Dandridge explained that the police were "just trying to locate" co-defendant Hawkins during that period. Detective Dandridge further testified that he, personally, did not collect a cell phone from co-defendant Hawkins upon his arrest. Detective Dandridge acknowledged that a cell phone was an important piece of evidence and that had the police been able to secure co-defendant Hawkins's cell phone, rather than simply phone records, the police possibly would have been able to see more things from the phone itself, like videos, photographs, and Facebook information.

Detective Dandridge confirmed that he interviewed co-defendant Hawkins for several hours after his arrest and that during the interview, co-defendant Hawkins ultimately admitted to participating in the murders. The interview was recorded, and co-defendant Hawkins's statement was reduced to writing and completed at 10:10 p.m. After thoroughly reading the eight-page statement, co-defendant Hawkins signed it at 11:08 p.m. that evening.[4] Detective Dandridge confirmed that Defendants Turner and Thomas were not arrested until after the January 2017 indictment was returned in this case.

Rueben Ramirez monitored inmate phone calls for the Shelby County Sheriff's Office, and he explained that when an inmate placed a call using a jail phone, the inmate was warned that the phone call would be recorded and monitored. The Defendants and the State stipulated that a recording contained a September 20, 2017 phone call between Defendant Thomas and Deangelo Leachman, a cousin of Defendant Turner. The recording was played for the jury. In the recorded phone call, Defendant Thomas discussed how he had received a letter in the mail from Defendant Turner, who told him that the State had offered her probation. Defendant Thomas asked Mr. Leachman to tell Defendant Turner not to accept the probation offer because that would be "like a sign of guilt" given that she would have to admit to some level of involvement in the murders. Defendant Thomas said that Defendant Turner needed to "stick to the script" and not be "tricked" into probation. They also discussed the weaknesses in the State's case, including the lack of evidence placing the Defendants at the scene and the varying statements made by co-defendant Hawkins.

Jeremiah Isom, the younger brother of Anthony, explained that Anthony was also known as "Big Fella" and "Hoppo," and Jeremiah acknowledged that he and Anthony were formerly members of the Vicelords gang. Jeremiah said that he, along with Mr. Glover and Ralph Martin, occasionally spent the night at Anthony's residence; that people frequently hung out and occasionally played dice at Anthony's residence; and that the Vicelords sometimes gathered at Anthony's residence to hold meetings and conduct gang business. Jeremiah further affirmed that he was familiar with Defendant Turner, aka

---

[4] Neither the written statement nor recording were entered as exhibits at trial.

"Ronda," because he had seen her at Vicelords meetings at Anthony's residence once or twice and that he had also seen co-defendant Hawkins at these meetings a couple of times.

Jeremiah explained that Mr. Martin, aka "Big Ralph," and Defendant Thomas, aka "Little Tony," were the leaders of the gang, and Anthony was next in charge. According to Jeremiah, Mr. Martin was killed a few weeks before the murders in the present case. On the day of Mr. Martin's death, Mr. Martin had texted Jeremiah and asked to meet with him at Anthony's place. Once both men arrived, Jeremiah got into a vehicle with Mr. Martin. While the men were driving around, Mr. Martin was killed. According to Jeremiah, Defendant Thomas blamed him for Mr. Martin's death because, unbeknownst to Jeremiah, he was supposed to have been Mr. Martin's "security" when Mr. Martin was killed. Because Jeremiah was supposed to be Mr. Martin's security, he was supposed "to get violated" because Mr. Martin had been killed, and according to Jeremiah, Defendant Thomas wanted to bring him "up on charges about it." Jeremiah explained that Defendant Thomas spoke of punishing him by beating him up for five minutes and then kicking him out of the gang. Jeremiah further stated that Anthony and Mr. Glover, aka "Killa," were the only ones to stand up for him and that Anthony offered to take his punishment for him.

Jeremiah testified that on September 25, 2015, he arrived at Anthony's house around 5 p.m. Jeremiah said that though he was no longer a member of the Vicelords gang at that time, he wanted to spend time with his brother Anthony. According to Jeremiah, Defendants Thomas and Turner arrived at the residence around 7 p.m. in a maroon four-door Mercury Grand Marquis; Jeremiah stated that he had seen the Defendants in this vehicle numerous times before. Jeremiah indicated that he tried to avoid Defendant Thomas, but that otherwise, the circumstances were "normal" during the get together. After the Defendants and Anthony went inside Anthony's house, they had a meeting, and Jeremiah waited outside with his other brothers. Mr. Glover and Ms. Springfield were also at the residence. When Jeremiah left Anthony's residence around 9 p.m., the Defendants were still present and the atmosphere was still congenial.

Jeremiah recalled that Anthony, Mr. Glover, and Defendant Thomas were armed that evening, relaying that Anthony was carrying a Glock 17 handgun after he traded weapons with Defendant Thomas that evening. Around 2 a.m. on September 26, Jeremiah learned that his brother had been murdered.

According to Jeremiah, Defendant Thomas called him "the next day" and claimed that Anthony was still alive when he left the residence around 10:00 p.m. that evening. Jeremiah told Defendant Thomas to come to the candlelight service for Anthony if he was not guilty of killing Anthony, whom Defendant Thomas claimed to love, but Defendant Thomas declined the invitation.

Jeremiah confirmed that as part of Anthony's gang responsibilities, he kept a notebook, or an "account sheet," wherein Anthony notated the names of the gang members, the amount of dues, and attendance at meetings. Jeremiah identified the green notebook found by police at Anthony's residence, which was entered into evidence.

On cross-examination, Jeremiah admitted that he had probably smoked "a couple marijuana blunts" that morning and that once he was at Anthony's, everyone, including himself, was smoking marijuana. Jeremiah also testified that an individual called "T," who was a friend of Anthony's, was present at Anthony's house around 8:00 p.m. on the evening of September 25. According to Jeremiah, T drove a dark-colored "older model four-door Mercury," in which he had arrived that evening. Jeremiah also confirmed that another one of their brothers, Cory Burkins, drove a burgundy 1991 Buick Regal four-door car at the time of the murders and that Mr. Burkins was dark-skinned with dreadlocks and was about five feet, eight or nine inches tall. Jeremiah also affirmed that James Brannon was a member of the Vicelords and that Mr. Brannon was a light-skinned man who drove a burgundy 1995 Mercury Grand Marquis, though Jeremiah said that he did not see Mr. Brannon at Anthony's on September 25.

Jeremiah described Defendant Thomas's appearance on that evening, stating that he was bald and wore a black hoodie and white jogging pants. Jeremiah acknowledged, though, that in his police statement given on September 26, he described Defendant Thomas as follows: "Short, about 5'7, slim, 140 pounds, bald-headed, black Forces, black and white jogging pants, and an all-red Richlord shirt." Despite this, Jeremiah continued to assert that Defendant Thomas arrived in a black hoodie. Jeremiah also said that Defendant Thomas carried a .40 caliber handgun that evening after the trade with Anthony.

When asked about attendance at the gang meetings and how an individual was recorded as present, Jeremiah said that the individual had to be present. However, he clarified that attendance could be excused by calling ahead to Anthony, Mr. Martin, or Defendant Thomas and that they would write the person's name in the notebook, as well as stating that one could show up early to pay dues, write one's name in the notebook, and then leave. Jeremiah agreed that these were two ways one's name could appear in the notebook even if not present for the actual meeting.

Jeremiah also explained that though he testified on direct that he had only seen Defendant Turner at meetings inside Anthony's once or twice, he stated that Defendant Turner was always with Defendant Thomas and that he saw them at the house three or four times a week because Defendant Turner was Defendant Thomas's driver. Jeremiah also confirmed that Anthony was a drug dealer and sold marijuana directly from his house to people he knew.

On redirect, Jeremiah testified that Anthony only let his family, friends, or gang members inside the residence and that drug purchasers were not allowed inside. According to Jeremiah, Anthony kept his marijuana in a jar on a table next to his bed.

Jerrico Isom, another younger brother of Anthony's, testified that he did yard work and housework for Anthony at Anthony's residence because Anthony needed help with regular chores due to his being extremely obese. Jerrico testified that on September 25, 2015, he worked at Anthony's house beginning around 8 a.m. and that he left the residence around 9 p.m. that evening. Jerrico recalled that he saw Defendant Thomas at Anthony's house that day. Jerrico said that he overheard a conversation that evening between Defendant Thomas and two other men, one of whom was called "Little Solid," that took place on the sidewalk out front of Anthony's home. Jerrico said that he heard Defendant Thomas remark that "Big Five," referring to Anthony, was "in the way," and that Little Solid agreed to making some sort of "motion[.]" Jerrico believed that this meant that the men were "going to try to jump on" Anthony, so Jerrico informed Anthony about the men's conversation. However, Anthony was not worried about Defendant Thomas's threat, according to Jerrico.

On cross-examination, Jerrico agreed that he had been drinking alcohol all day on September 25, but he said that this did not affect his memory of what he overheard that day. Jerrico confirmed, however, that his memory of these events had been "flashing back" to him. In addition, Jerrico affirmed that he did not disclose his recollection of this conversation to police until 2019.

Elesha Malone, Anthony's father, recalled seeing Defendant Thomas at Anthony's house fairly often for Vicelords meetings. In addition, Mr. Malone said that he had seen co-defendant Hawkins, whom he described as a tall "bright-skinned" guy, at Anthony's residence a few times for meetings and that he had seen Defendant Turner at the residence once or twice before.

Mr. Malone recalled that on September 25, 2015, he arrived at Anthony's house between 10:00 and 11:00 a.m. and that Anthony, Defendant Thomas, Mr. Glover, and Ms. Springfield were on the front porch of the residence, shooting dice. When Mr. Malone returned to Anthony's residence around 11:30 p.m. or 12 a.m., Anthony, Defendant Thomas, Ms. Springfield, and possibly Mr. Glover, were still sitting on the front porch of Anthony's house. Mr. Malone said that while he was walking, someone with a gun used a red laser to point at Mr. Malone from Anthony's porch. Mr. Malone heard Anthony in a friendly tone say, "I see you, daddy," and as the group from the porch went inside Anthony's house, Mr. Malone heard Defendant Thomas say, "All right, Pops." Mr. Malone did not find any of these actions or statements to be threatening. As Mr. Malone was walking away from Anthony's residence, he looked back and saw Defendant Thomas still standing in the doorway looking at him, which Mr. Malone thought was kind of strange.

- 9 -

Mr. Malone recalled that the Defendant Thomas "was always with" Defendant Turner in a red vehicle, and he saw the Defendant's vehicle parked across the street from the Anthony's house that evening, facing toward Chelsea Avenue. Mr. Malone indicated that he did not see Defendant Turner at the residence that evening.

On cross-examination, Mr. Malone confirmed that Anthony had been shot in the arm several years prior by Mr. Burkins, Anthony's older brother, though Mr. Malone explained that the shooting was accidental and that charges were not pursued against Mr. Burkins. Mr. Malone also agreed that had he had been using crack cocaine on September 25, 2015, when the relevant events took place and that he returned to Lake Grove Street that evening to secure more drugs from one of Anthony's neighbors named "Larry." Mr. Malone said that he stayed at Larry's residence for approximately one to one-half hours talking to Larry outside before he left without any drugs.

Co-defendant Hawkins testified that he was a member of the Vicelords gang, that he was close friends with Mr. Martin, who was Three Star Universal Elite and the top-ranking member of the gang. He confirmed that the Defendants were also members of the gang, that he was familiar with the Defendants because they attended gang meetings, and that Defendant Thomas was a Three Star Branch Elite. According to co-defendant Hawkins, Anthony was a Five Star Branch Elite, so Anthony ranked higher than Defendant Thomas. Finally, co-defendant Hawkins indicated that Mr. Glover was also a member of the gang but that Ms. Springfield was not.

Co-defendant Hawkins explained that if a top-ranking gang member was killed, then the member who "sent" that high ranking member out without security must also be killed. Co-defendant Hawkins confirmed that Mr. Martin was killed at a local gas station on September 2, 2015; that according to gang protocol, "something had to be done about it," meaning that the next person in charge had "to get it"; and that Defendant Thomas was in charge of making that decision. Co-defendant Hawkins said that because Anthony was the highest ranking member after Mr. Martin, Anthony was responsible for arranging Mr. Martin's security.

According to co-defendant Hawkins, on September 25, gang members met in Binghampton at Little Solid's residence on Pope Street. Co-defendant Hawkins said that Defendant Thomas oversaw the meeting, which started at 4:30 p.m.; that Defendant Turner was present for the meeting; and that the members in attendance, including Little Solid and Big Five, discussed murdering Anthony due to Mr. Martin's death. Despite his prior description of gang protocol, co-defendant Hawkins claimed that he and the other members were shocked that Defendant Thomas wanted to murder Anthony. Co-defendant Hawkins conveyed that no one volunteered to murder Anthony, so the plan did not go forward and the meeting ended.

- 10 -

However, after the meeting, Defendant Thomas pulled co-defendant Hawkins aside and asked co-defendant Hawkins to help him murder Anthony. Co-defendant Hawkins admitted that he and Anthony had been arguing off and on about an "old video" in which co-defendant Hawkins lost a fight because Anthony sometimes made fun of him for it, though co-defendant Hawkins asserted that he did not want to kill Anthony for this reason. Co-defendant Hawkins said that he agreed to murder Anthony because Defendant Thomas outranked him and because he believed that he would be murdered if he did not assist Defendant Thomas.

According to co-defendant Hawkins, Defendant Thomas told him to meet at Anthony's residence between 12:30 and 1:00 a.m. and to bring gloves. Co-defendant Hawkins returned home after the Binghampton meeting where he smoked some marijuana and spent some time talking with his girlfriends on the phone. Around 11:30 p.m., he finished talking with "Katie," but he told her not to hang up the phone until he returned. He placed the phone on the charger and left.

Thereafter, a friend took co-defendant Hawkins to the corner of Warford and Chelsea Avenue where he got out of the car and proceeded toward Anthony's residence. Co-defendant Hawkins said that he was wearing a black shirt and jean shorts at the time and that he was unarmed. As co-defendant Hawkins approached Anthony's on foot, Defendant Thomas, who was sitting in the burgundy vehicle across the street, called out to co-defendant Hawkins. Defendant Turner was also in the car. Co-defendant Hawkins got into the back seat of the burgundy vehicle, and Defendant Thomas, who was in the driver's seat according to co-defendant Hawkins, asked him if he was "ready to handle a little business." Defendant Thomas then asked co-defendant Hawkins to retrieve a 9mm handgun from underneath the rear passenger seat, and co-defendant Hawkins complied.

Both co-defendant Hawkins and Defendant Thomas wore gloves as they exited the vehicle and walked up to Anthony's residence. Co-defendant Hawkins further described that Defendant Thomas was wearing a red Richlord shirt and a hat as they approached, as well as confirming that Defendant Thomas was bald-headed at the time. According to co-defendant Hawkins, Defendant Thomas knocked on the door; Anthony answered the door; Defendant Thomas shot him with a handgun that looked like a Glock 17; and Anthony "hit the ground." Co-defendant Hawkins testified that after Anthony was on the ground, he also shot Anthony in the "lower back somewhere." Co-defendant Hawkins estimated that they initially shot Anthony a total of three times. When Mr. Glover ran to the rear of the residence, Defendant Thomas chased him to the back bedroom and shot at him more than once. Co-defendant Hawkins then went to the rear of the residence, observed Ms. Springfield trying to escape out the window, and shot her. Ms. Springfield fell to the floor. Though Defendant Turner had originally stayed in the car, she entered the room and asked if Ms. Springfield was dead, to which co-defendant Hawkins said, "I guess so." According

to co-defendant Hawkins, Defendant Turner then asked him for his gun, which he gave to her, and she also shot Ms. Springfield.

Co-defendant Hawkins testified that Defendant Thomas shot Anthony six or seven more times, "grabb[ed] guns and the money[,] and ran out the door." Co-defendant Hawkins said that Anthony kept a .380 and a 9mm in the house and money under his mattress. According to co-defendant Hawkins, Defendant Turner stole a glass jar containing marijuana from the residence, which she dropped outside on the porch. Thereafter, Defendant Thomas, co-defendant Hawkins, and Defendant Turner left the house, in that order according to co-defendant Hawkins, got into the burgundy vehicle, and drove away. Defendant Thomas, who was driving the vehicle, dropped co-defendant Hawkins off at the corner of National Street and Macon Avenue. Co-defendant Hawkins then disposed of his gloves and walked to his residence. Co-defendant Hawkins acknowledged that at some point thereafter, he messaged a friend, Ms. Dorris, about his involvement in the murders, though he claimed he was not bragging.

Co-defendant Hawkins admitted that he did not disclose "the whole truth" to the MPD in his first statement. Initially, co-defendant Hawkins admitted that Defendant Thomas was involved in the murders, but he did not tell the MPD about the involvement of Defendant Turner other than her serving as a look-out, that he asked Katie to keep the phone call active, or that he shot Ms. Springfield. He also confirmed that after his arrest, he called his mom and one of his girlfriends, Chastity Cooper, and proclaimed his innocence, though such was untrue.

Co-defendant Hawkins confirmed that he had spoken with the prosecutor on three prior occasions before trial. Though he told the prosecutor on one of those occasions that they had taken a right onto Chelsea Avenue as they drove away from Anthony's, he was confident that they turned left. Co-defendant Hawkins also acknowledged that he did not originally tell the prosecutor that a friend had dropped him off near Anthony's house, explaining that he did not want to get that person in trouble. Finally, he affirmed that he had no deal with the State in exchange for his testimony, though he had been told that if he told the truth, that would "be taken into consideration."

During cross-examination, co-defendant Hawkins testified that he was twenty-eight years old and six feet, four inches tall. He agreed that after his arrest in this case, he asked his mother to make sure his attorney got his employment records because he claimed that they would show that he was at work at the time of the murders. However, his employment records, when obtained, did not reflect such, and he acknowledged that he lied.

Co-defendant Hawkins testified that Ms. Dorris was a friend, but not one of his girlfriends, and that he knew Ms. Dorris had been communicating with Anthony prior to the murders. Sometime before September, Ms. Dorris showed him a copy of some of the

Facebook messages between her and Anthony. He acknowledged that Ms. Dorris had seen the video of his getting beat up and that Anthony was the one who showed it to her. Co-defendant Hawkins confirmed that he sent a message to Ms. Dorris through the KIK messenger application in November 2015, alleging that he murdered Anthony and another individual. After the trial court prohibited the defense from admitting a copy of a printout of the KIK message, the following colloquy then took place:

> Q. . . . Is it true that you told [Ms. Dorris], "The last time you talk all that s--t by listening to a fat MF. But guess what, I murked that n---a." You said that to [Ms. Dorris], right?
> A. Yes, ma'am.
> Q. Okay. And you were talking about Hoppo, weren't you?
> A. Yes, ma'am.
> Q. And when you said you murked him, what did you mean?
> A. Killed him.
> Q. Okay. And you also said, in the same message, "I murked that n---a and the n---a that broke me off. Shot him, too." Right?
> A. Yes, ma'am.

Co-defendant Hawkins affirmed that though he claimed in the message to have killed the man who had beaten him previously, such was not true. He claimed that he sent this message to Ms. Dorris because she was "getting on [his] nerves." He also acknowledged that this message was the reason he ultimately got arrested for these murders.

According to co-defendant Hawkins, he was not hiding out between November 2015 and May 2016. He was living with his mother at all times on Hardin Avenue and working. A map reflecting the distance between co-defendant Hawkins's house and Anthony's house was entered as an exhibit.

Co-defendant Hawkins testified that his cell phone was in his pants pocket during his arrest and that "[t]he investigators took it." In his jail call to Ms. Cooper after his arrest, he told her that "the homicide people" took his cell phone. In a later jail call to Ms. Cooper, he told her that "[t]he detective from homicide told" him to write that he was involved in the murders and claimed that it was a "set up." He also made a similar assertion in the phone call to his mother.

Co-defendant Hawkins confirmed that during the MPD interview, he initially denied any knowledge of the murders but that later on in the interview, he told them "half of the truth" after they showed him photographs and were talking to him about the murders. He agreed that there were inconsistencies between his testimony at trial and the statement that he gave to the MPD, such inconsistencies in the statement being that Anthony was able to walk Ralph to the store, that he rode to Anthony's in Defendant Turner's car, that Mr.

Glover was the first one to answer the door, that he shot Anthony "right at the end" of the encounter, that Defendant Thomas was the one who shot Ms. Springfield, that the murders took place around 9:00 or 10:00 p.m., that Defendant Turner never went inside the house, that he left the house by running around the back and walking home, and that Defendant Thomas never called him afterward to meet and retrieve his 9mm handgun. When asked why his statement was signed an hour after it was completed, co-defendant Hawkins was unsure and opined that it did not take him a full hour to read and sign his MPD statement. In addition, co-defendant Hawkins admitted that he was not completely truthful with the prosecutor when he spoke with to him during the proffer sessions, for example, telling him at one point that no one wore gloves. He agreed that he was hoping to avoid a life sentence by testifying against the Defendants.

Co-defendant Hawkins confirmed that the Binghampton meeting lasted between fifteen and thirty minutes and that only seven or eight people were present, which was also contrary to his assertion to the MPD that thirteen people were in attendance. Co-defendant Hawkins's cell phone records were entered as an exhibit and showed that he placed a call at 4:32 p.m. when the Binghampton meeting was supposed to be taking place. He agreed that the call was to Katie and that it lasted four minutes. The records further reflected that he answered a call at 4:38 p.m. and that the call lasted nine minutes. The call co-defendant Hawkins claimed to have made to Katie around 11:30 p.m. that evening before leaving his house for the murders was not present in his cell phone records. However, in the records, there was a call received from Katie at approximately 1:15 a.m. that lasted over one and half hours.

Regarding the friend who gave him a ride to Anthony's, co-defendant Hawkins claimed that it was spontaneous and not pre-planned and that he had encountered the friend that evening by happenstance. Though he agreed that the friend had died in 2016, he claimed that he was still trying to protect him previously because he did not know of the friend's death until 2018 despite the two having been "good budd[ies]."

B. Defendants' Proof. Brad Webb, who retired from the MPD in 2017, responded to Anthony's residence on September 26, 2015, to investigate the murders. The scene of the murders had already been secured when he arrived. He agreed that there were blood stains in the kitchen area of the home. He did not recall if any weapons were found inside the house, but he confirmed that some "ammunition cases" were recovered. He recalled that Defendant Thomas was "the main suspect" in this case but that they knew he did not act alone. He could not recall if Mr. Brannon was ever investigated as being involved in these murders.

Lieutenant James Sewell of the MPD also investigated the murders. He searched Defendant Thomas's residence on Park Avenue, and he transported evidence collected from both Anthony's residence and Defendant Thomas's residence to the Tennessee

Bureau of Investigation. With regard to the clothing collected, Lieutenant Sewell asked that the clothing from Anthony's residence be tested for "blood DNA" and that the evidence from Defendant Thomas's residence be tested for the victim's blood. He did recall that one of the shirts collected from the Defendants' car said Richlord on it.

Kasia Lynch testified as expert in the field of firearms identification. She testified that she examined twelve bullets or bullet fragments, twenty-one 9mm-caliber cartridge cases, one .380 automatic cartridge case, and forty .22 caliber cartridge cases. She compared all of the 9mm cartridge cases and determined that ten of them had been fired through one 9mm gun, one of them had been fired through a second 9mm gun, and then another ten of them had been fired through a third 9mm gun. She also determined that all forty of the .22 caliber cartridges were fired by the same gun.

Ms. Lynch also examined the bullet fragments. She determined that two of the fragments could have been fired by the same gun, but that there was not enough evidence to say for certain. She also determined that eight fragments had been fired by a different gun than any gun that fired the first two fragments. She was able to determine that none of the items were fired through a .40-caliber weapon.

In addition, she acknowledged that there was no way for her to determine how long the bullets, bullet fragments, and cartridges had been at the crime scene or when the cartridges were fired. Regarding the bullets taken from the victims' bodies during autopsy, she said that she was able to confirm two of them were 9mm bullets. She indicated that a Glock 17 could shoot 9mm bullets. In her report, she also determined that a bullet taken from Mr. Glover and a bullet taken from Ms. Springfield were fired through a different weapon than bullets retrieved from Anthony's body.

Courtney Hankins, also known as Little Solid, testified that he was formerly a member of the Binghampton Vicelords gang. Mr. Hankins claimed that his brother, Cory Hankins, was known as Big Five. Mr. Hankins also claimed that he unfamiliar with and did not recognize co-defendant Hawkins. He denied that Defendant Thomas held any rank within the Vicelords gang or ever led a Vicelords meeting. He also denied that Mr. Martin and Anthony held any rank within the gang.

He stated that he was not present at Anthony's house on September 25, 2015, so he could not have had a discussion with Defendant Thomas on that day. He also denied that Defendant Thomas and other gang members met at his residence on Pope Street to discuss murdering Anthony, and he asserted that he had not heard anything about holding Anthony responsible for Mr. Martin's death. He did admit that the Vicelords gang met at his house for "a barbecue for the kids and everything," and he admitted that Defendant Thomas attended this event, though Defendant Turner did not.

Jasmine Dorris testified that in September 2015, she was sixteen years old and in a sexual relationship with co-defendant Hawkins, who was her boyfriend. She knew Anthony from Facebook, and she recalled that Anthony sent her a message prior to his murder about a fight that co-defendant Hawkins lost to another individual. When Ms. Dorris asked co-defendant Hawkins about the fight, he "got a little carried away and mad about it." Ultimately, the couple separated. Ms. Dorris confirmed that after Anthony was killed, co-defendant Hawkins sent her a message trying to get back together with her and that she showed this message to the police because he implicated himself in the murders.

Antoine Dotson, Defendant Turner's cousin, stated that he lived close to the residence of Defendants Thomas and Turner, who cohabitated, and that he visited them frequently. He recalled that he arrived at the Defendants' residence around 12:00 a.m. on September 26, 2015, to spend time with Defendant Turner. When he arrived, Defendant Turner was asleep, and Defendant Thomas's family was present. He testified that he remembered being at the Defendants' residence on this occasion because he recalled hearing news of the murders the following day. Photographs reflecting Defendant Thomas's multiple tattoos were admitted into evidence during Mr. Dotson's testimony. Mr. Dotson admitted that he was a member of the East Memphis Vicelords gang and that he knew Anthony, Mr. Glover, and Mr. Martin, but he denied speaking with the Defendants about killing Anthony as retribution for Mr. Martin's death.

Terriell Marshall, another cousin of Defendant Turner's, testified that he lived a few miles away from the Defendants' residence on Park Avenue. He was not affiliated with any gang and did not know Anthony, Mr. Glover, or Ms. Springfield. Mr. Marshall believed that he had been to the Defendants' residence twice. He recalled an evening when he spent some time with Mr. Dotson there. He said that Mr. Dotson picked him up around 12:00 or 12:15 a.m. and that they proceeded to the Defendants' residence, where both Defendants were present. He believed they stayed about three hours. However, he could not provide a specific date when this occurred.

C. Verdict, Sentencing, and Post-trial Motions. Following the conclusion of proof, the jury convicted the Defendants of the three killings as charged, and the Defendants received sentences of life imprisonment on all counts. The trial court ordered Defendant Thomas to serve two of his life sentences consecutively and for all of Defendant Turner's life sentences to be served concurrently.

The Defendants both filed a renewed motion for judgment of acquittal, or in the alternative, a motion for new trial. The trial court denied the motions, and the Defendants timely appealed.

ANALYSIS

On appeal, the Defendants contend that (1) the evidence was insufficient to support the convictions, specifically whether co-defendant Hawkins's testimony was reliable and sufficiently corroborated; (2) the trial court erred by denying their motion to dismiss the indictment due to the State's Ferguson violation by failing to preserve the photographic lineups shown to the witnesses and co-defendant Hawkins's cell phone taken upon his arrest; (3) the trial court erred by not granting a new trial because the State committed a Brady violation by failing to disclose all inconsistent statements made by co-defendant Hawkins during proffer sessions; (4) the trial court committed error when it sua sponte prohibited the introduction of the printout of co-defendant Hawkins's KIK message to Ms. Dorris implicating himself in the murders, and in so doing, made an improper comment on the evidence; and (5) the trial court erred in instructing the jury by including the language "or either of them" throughout the jury instructions.[5]  We will address each in turn.

*I. Sufficiency of the Evidence*

The Defendants contend that the evidence is insufficient to support their convictions for first-degree murder, arguing that co-defendant Hawkins's testimony was unreliable and not sufficiently corroborated.  The State responds that the evidence is sufficient because numerous witnesses observed the Defendants at the crime scene prior to the murders, the Defendants admitted that their vehicle was at the crime scene, and co-defendant Hawkins's credible testimony established that they planned and executed the murders of the three victims.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State.  See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury.  See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

---

[5] Defendant Thomas did not initially raise the KIK message and jury instruction issues in his appellate brief. After oral argument, this court granted Defendant Thomas's request that we consider Defendant Turner's arguments concerning the KIK message and the jury instructions as if presented by both of the Defendants. For the sake of clarity, we will discuss the issues as if raised on appeal by both Defendants and frame the State's arguments accordingly.

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

It is well-established in Tennessee that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). In this case, co-defendant Hawkins was an accomplice who was indicted for the same offenses as the Defendants. See State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); Pennington v. State, 478 S.W.2d 892, 897-98 (Tenn. Crim. App. 1971) (citations omitted).

Our supreme court has described what is required to establish sufficient corroboration as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803). The corroborating evidence need only be "slight." State v. Griffs, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). While "[e]vidence which merely casts a suspicion on the accused . . . is inadequate to corroborate an accomplice's testimony," the "evidence is sufficient if it connects the accused with the crime in question." Id. Whether there is sufficient corroborating evidence is a question for the jury. Shaw, 37 S.W.3d at 903.

Premeditated first-degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

Also, "[a] person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). "A person is criminally responsible for an offense committed by the conduct of another" if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2).

"Presence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). "No particular act need be shown. It is not necessary for one to take a physical part in the crime[;] [m]ere encouragement of the principal is sufficient." Id. Additionally, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." Dorantes, 331 S.W.3d at 386 (citing State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)).

Both Defendants challenge the proof of identity and whether co-defendant Hawkins's testimony was sufficiently corroborated in that regard. The proof in the light most favorable to the State at trial established that Anthony, the Defendants, Mr. Martin, Mr. Glover, and co-defendant Hawkins were all members of the Vicelords gang. Mr. Martin, a Three Star Universal Elite, was the highest ranking member; Anthony was the next highest ranking member as a Five Star Branch Elite; and Defendant Thomas ranked under Anthony. According to witness testimony, gang protocol required that if a top-ranking gang member such as Mr. Martin was killed, the member who "sent" the high ranking member out without security must be killed. After the murder of Mr. Martin on September 2, 2015, Defendant Thomas blamed Jeremiah, Anthony's brother, for Mr. Martin's death because Jeremiah failed to provide security for Mr. Martin. According to Jeremiah, the only gang members to stand up for him were Anthony and Mr. Glover, and Anthony offered to take Jeremiah's punishment for him.

- 19 -

On September 25, prior to Jerrico's departure from Anthony's residence around 9 p.m., Jerrico overheard a conversation between Defendant Thomas, Little Solid, and another man on the sidewalk outside of Anthony's residence. According to Jerrico, Defendant Thomas remarked that Anthony was "in the way[,]" and Little Solid agreed to "motion[.]"

Co-defendant Hawkins testified that on September 25 around 4:30 p.m., he, the Defendants, and other Vicelords members met at Little Solid's residence in Binghampton. According to co-defendant Hawkins, Defendant Thomas oversaw the meeting, and the members in attendance discussed murdering Anthony in retribution for Mr. Martin's death, though ultimately no one volunteered and the plan did not go forward. Co-defendant Hawkins said that after the meeting concluded, Defendant Thomas pulled him aside and asked him to help him with murdering Anthony. Defendant Thomas told co-defendant Hawkins to meet at Anthony's residence between 12:30 and 1:00 a.m. and to bring gloves.

Multiple witnesses testified that Defendant Thomas was present at Anthony's residence earlier in the day on September 25, 2015—Jerrico, Jeremiah, and Mr. Malone. Jeremiah testified that he saw Defendant Turner, along with Defendant Thomas, at the residence around 7 p.m. in their maroon four-door vehicle. According to Jeremiah, Defendant Thomas carried a .40 caliber handgun that evening, after trading a Glock 17 for it with Anthony. Mr. Malone, Anthony's father, saw Defendant Thomas shooting dice at Anthony's residence around 11 a.m., and Defendant Thomas was still at the residence around 11:30 p.m. or 12 a.m. Mr. Malone further testified that he saw the Defendants' red vehicle parked across the street from Anthony's residence on his return visit that evening and that the vehicle was facing toward Chelsea Avenue.

Early in the morning of September 26, 2015, Mr. Jennings was sitting on his couch when he heard someone say, "Don't shoot me." He then heard a different individual say, "You done [sic] messed up." After these statements, Mr. Jennings heard "[a] lot of shooting." He also heard a woman scream. He testified that he looked out his window and observed two Black men walking away from Anthony's residence and that the two men got into a "big" burgundy vehicle, which was parked across the street from Anthony's residence and faced toward Chelsea Avenue. Mr. Jennings called 911 at 1:31 a.m., during which he described the car as a maroon-colored vehicle with four doors.

Co-defendant Hawkins testified that on the evening of September 25, when he arrived at Anthony's residence, the Defendants were sitting in their burgundy vehicle across the street from Anthony's residence and that they motioned for him to come to the vehicle. After co-defendant Hawkins got inside the car, Defendant Thomas asked if co-defendant Hawkins if he was "ready to handle a little business" and instructed co-defendant Hawkins to retrieve a 9mm handgun from underneath the rear passenger seat, which he did.

- 20 -

Co-defendant Hawkins said that both he and Defendant Thomas wore gloves as they exited the car and approached Anthony's. According to co-defendant Hawkins, Defendant Thomas knocked on the door, Anthony answered the door, and Defendant Thomas shot him with a handgun that looked like a Glock 17. Co-defendant Hawkins also shot Anthony, who "hit the ground." When Mr. Glover ran to the rear of the residence, Defendant Thomas chased him and shot at him. Co-defendant Hawkins also went to the rear of the residence, where he observed Ms. Springfield trying to escape out the window and shot her. Then, according to co-defendant Hawkins, Defendant Turner entered the room, asked if Ms. Springfield was dead, and shot Ms. Springfield with co-defendant Hawkins's gun. According to co-defendant Hawkins, Defendant Thomas then shot Anthony six or seven more times before grabbing guns and money and running out the door. Co-defendant Hawkins also testified that Defendant Turner stole a glass jar containing marijuana from Anthony's residence, which she dropped outside. According to co-defendant Hawkins, the three of them got into the burgundy vehicle and left the area.

Defendant Thomas challenges the credibility of co-defendant Hawkins's testimony, noting the multiple contradictions between his various statements and testimony. He also notes that Mr. Jennings did not identify him as one of the shooters in the photographic lineup, though his picture was included therein, and that Mr. Jennings's description of the shooters did not match his appearance. However, the jury was free to credit some portions of co-defendant Hawkins's testimony and reject others. See State v. Winters, 137 S.W.3d 641, 658 (Tenn. Crim. App. 2003) (concluding that "the jury's role as the trier of fact is to determine which portions of the evidence are illustrative of the truth relative to disputed events"). Moreover, these inconsistencies pointed out by Defendant Thomas were not "'so improbable or unsatisfactory as to create a reasonable doubt of the [Defendant's] guilt.'" State v. Elkins, 102 S.W.3d 578, 583 (Tenn. 2003) (quoting State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999)). It is the province of the jury, not this court, to resolve any conflicts in the evidence.

All three of the victims suffered multiple gunshot wounds, and their manner of death was determined to be homicide. Blue gloves were found upon a search of the Defendants' vehicle. Broken glass and baggies of marijuana were found on the sidewalk near where the suspect vehicle was parked. There was a writing found on a wall inside of Anthony's residence "that said rest in peace Ralph" and was dated September 2, 2015. Ms. Lynch testified that the 9mm cartridges had been fired by three different guns; that two of the bullets retrieved from the victims' bodies during autopsy were 9mm bullets; that a Glock 17 can fire 9mm bullets; that two of the bullet fragments were likely fired by the same gun, though she could not say for certain; and that eight other bullet fragments had been fired by a different gun than the two.

The surveillance video footage showed that the suspect vehicle arrived at Anthony's house around 10:30 p.m. and that there was movement indicative of someone exiting the vehicle. No additional movement occurred inside the car until after 1:30 a.m. when it appeared that someone got inside the vehicle. The vehicle was then driven away from the scene, turning left on Chelsea Avenue before disappearing out of the picture. The still-shot photograph taken from the recording depicted a similar car to the one the Defendants were known to drive, and the Defendants both later admitted that the vehicle in the still-shot photograph was their vehicle.

Based on this evidence, the jury could have reasonably inferred that Defendant Thomas plotted to murder Anthony as revenge for Mr. Martin's murder. And the proof established that Defendant Thomas was an "active participant in the events resulting in the victim[s'] death[s] and not merely present before and after the offense." State v. Antonio M. Crockett, No. M2015-00566-CCA-R3-CD, 2016 WL 769890, at *13 (Tenn. Crim. App. Feb. 29, 2016). Mr. Malone placed Defendant Thomas at the residence around 11:30 p.m. or 12:00 a.m. after the suspect vehicle had been parked across the street for over one hour. Mr. Jennings testified that after hearing gunfire, he saw two Black men exit Anthony's house and get inside the vehicle before driving away. Based on this evidence, co-defendant Hawkins's testimony was sufficiently corroborated. The jury could have reasonably inferred that Defendant Thomas committed the murders and left the scene in the Defendants' vehicle. See State v. Jordan Clayton, No. W2018-00386-CCA-R3-CD, 2019 WL 3453288, at *16 (Tenn. Crim. App. July 31, 2019) (affirming the defendants' first-degree premeditated murder convictions when the defendants planned to murder the victim in retaliation for the death of a family member), perm. app. denied (Tenn. Dec. 10, 2019).

Defendant Turner's convictions rest on less corroboration. Mr. Jennings testified that he only saw two men exit Anthony's residence, that he did not see anyone other than the two men get inside the car that night, and that he never saw any woman accompanying the men. The surveillance footage did not reflect how many individuals were present inside the Defendants' vehicle as it passed in front of the camera on Chelsea Avenue. Though the State claimed that numerous witnesses placed Defendant Turner at Anthony's house earlier in the day, in fact, only one witness, Jeremiah, testified that she was present. Jeremiah testified that the Defendants both arrived in their vehicle around 7 p.m. And, if the State's proof was to be believed, the Defendants' vehicle left the residence sometime thereafter and did not return until 10:30 p.m.; an event captured on the video. No witness placed Defendant Turner at the residence any time after 10:30 p.m.

In addition, only co-defendant Hawkins discussed the earlier meeting in Binghampton where they discussed killing Anthony as retribution for Mr. Martin's death. Even co-defendant Hawkins himself stated that they did not reach a consensus at the formal portion of the meeting, that it was not until after the meeting was over that Defendant

Thomas pulled him aside and recruited him, and that Defendant Turner was not present during that conversation.

Jeremiah testified that Defendant Turner was with Defendant Thomas every time he saw Defendant Thomas at Anthony's house. He further testified that he saw them at the house three or four times a week and that Defendant Turner was Defendant Thomas's driver. Mr. Malone recalled that Defendant Thomas "was always with" Defendant Turner in a red vehicle and that he saw the vehicle that night parked out front of Anthony's house, facing toward Chelsea Avenue. Moreover, this testimony was also substantiated by the fact that Defendant Turner was present with Defendant Thomas at Anthony's residence earlier that evening. Though co-defendant Hawkins testified that Defendant Thomas was in the driver's seat when he got inside the Defendants' vehicle just before the murders, as well as stating that Defendant Thomas was the driver as they drove away from Anthony's house after the murders, the jury was again free to reject any portion of co-defendant Hawkins's testimony. Moreover, the surveillance video showed no evidence of any movement inside the car prior to shots being fired, discrediting co-defendant Hawkins's testimony that he met with the Defendants at any time prior to the murders. The presence of broken glass and marijuana baggies on the sidewalk also corroborated co-defendant Hawkins's testimony, though he said that Defendant dropped the jar on the porch. Finally, Defendant Turner was in the Vicelords gang with Defendant Thomas and was presumably aware of gang protocol. We affirm the sufficiency of the evidence based upon adequate corroboration, however slight. The Defendants are not entitled to relief.

## II. Alleged _Ferguson_ Violation—Missing Photographic Lineups and Cell Phone

The Defendants argue that the trial court erred in denying the motion to dismiss the indictment because the State violated Ferguson by failing to preserve the photographic lineups and co-defendant Hawkins's cell phone.[6] Relative to the photographic lineups, the Defendants assert that the State had a duty to preserve the original photographic lineups and that the State negligently failed in that duty. The Defendants note that the issue of identity was paramount in this case. Relative to co-defendant Hawkins's cell phone, the Defendants submit that because the State failed to preserve the cell phone, "the entirety of the phone's data was not made available" to the defense. The Defendants conclude that

---

[6] In Defendant Turner's reply brief, she argues for the first time that the trial court erred by not issuing an instruction regarding the lost photospreads. Issues raised for the first time in a reply brief are waived. See State v. Walter Francis Fitzpatrick, III, No. E2014-01864-CCA-3-CD, 2015 WL 5242915, at *8 (Tenn. Crim. App. Sept. 8, 2015); State v. Franklin Sanders, No. 02C01-9305-CR-00102, 1994 WL 413465, at *10 (Tenn. Crim. App. Aug. 10, 1994) ("The defendant cannot change issues from his original brief to his reply brief any more than he can change theories from the trial court to the appellate court."); see also Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7); Carruthers v. State, 814 S.W.2d 64, 69 (Tenn. Crim. App. 1991). Moreover, at no time during the proceedings did the Defendants ever request an instruction.

both items of evidence have significant probative value and that no adequate substitute evidence was available.

The State responds that the trial court properly denied the motion to dismiss the indictment based on the lack of preservation of the original photographic lineups because the Defendants had full access to the detective's copies of the lineups. The State also submits that the Defendants failed to establish that co-defendant Hawkins's cell phone contained any exculpatory evidence in addition to the records that the State disclosed. We agree with the State in both regards.

The Defendants filed a motion for dismissal of the indictment pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), based upon the State's alleged failure to preserve "as many as five photographic lineups" and co-defendant Hawkins's cell phone. The Defendants asserted that they could not receive a fair trial absent the missing evidence.

The motion stated that when officers were investigating the murders, they spoke with Terry Jennings, a next-door neighbor who reported hearing gunshots and seeing two people leave the victim's residence and proceed to a parked car. In Mr. Jennings's police statement, he indicated that he had been shown two photo lineups, one labeled A and the other B, and that he was unable to identify anyone in either of those lineups. Though the discovery materials included copies of Mr. Jennings's "Advice to Witness Viewing Photographic Display" forms, there were no copies of the photographic lineups shown to Mr. Jennings.

The motion further alleged that the police also spoke with Toney Reid, a passerby who advised that he saw a man and a woman leave the residence and proceed to a parked car. Mr. Reid also gave a police statement wherein he indicated that he was shown a photographic lineup labeled E and that he was unable to identify anyone from the lineup. Again, only the Advice form was included in the discovery materials, and any corresponding photographic lineup was absent. The Defendants alleged that this also raised the question of whether photographic lineups C and D existed and to whom those lineups may have been shown.

The Defendants asserted that the State had a duty to preserve these photographic lineups under Tennessee Rule of Criminal Procedure 16. The Defendants argued that because identity was an important issue in the case, evidence that the two witnesses failed to identify anyone "in at least three and perhaps as many as five different photographic lineups would play a significant role" in their defense and was potentially exculpatory. The Defendants indicated that they were unable to obtain comparable evidence because the State was "unable to produce either the original documents or copies of them."

Relative to co-defendant Hawkins's cell phone, the Defendants submitted that the police seized co-defendant Hawkins's cell phone upon his arrest on May 10, 2016, but that the prosecution was unable to produce the cell phone. The Defendants argued that the State had a duty to preserve the cell phone and that the cell phone's contents would play a significant role in their defense and were potentially exculpatory. According to the Defendants, the cell phone could have provided "[c]ellular data relevant to [co-defendant Hawkins's] whereabouts at the time of the homicide[] or tend[ed] to show that he or some third party participated in the homicides."

The State filed a response asking the court to deny the motion to dismiss the indictment. Regarding the photographic lineups, the State alleged that the Defendants' claim lacked merit because neither witness identified anyone in these lineups, information evidenced by the Advice forms. The State further indicated that the Defendants had been provided "Detective Copies" of photographic lineups A and B, as well as copies of three other photographic lineups. Though none of the other three lineups were specifically labeled E, the State asserted that the Defendants had "all the information available." Five photographic lineups were attached as exhibits.[7]

Relative to co-defendant Hawkins's cell phone, the State alleged that there was no record of any phone's being seized upon the co-defendant's arrest, specifically that there was "no supplement" or police evidence receipt and that no officer claimed to have seized any cell phone. The State asserted that it had, nevertheless, "endeavored to look diligently for this phone to no avail." Accordingly, the State submitted it had not failed in any duty to preserve something that it did not possess. Furthermore, the State contended that the absence of this evidence was "not of importance such that the Defendants [could] not receive a fair trial" because the Defendant had been provided with the cell phone records for the phone, including "location information."

At a November 30, 2018 motion hearing, the State acknowledged that the police did not retain the original sets of photographs that accompanied the Advice forms that Mr. Jennings and Mr. Reid viewed. Regarding the detective copies the State had provided to the defense, it was noted that photographic lineup A contained a photograph of Defendant Thomas and that lineup B (the one attached to the State's response) contained a photograph of an unidentified male suspect who was never charged in relation this case. The individuals depicted in photographic lineup C and the two unlabeled photospreads were

---

[7] At the motion hearing, both the State and counsel for Defendant Thomas acknowledged that the State disclosed a photospread labeled A, two photospreads labeled B, and two unlabeled photospreads. However, it is unclear to which of two photospreads labeled B the parties were referring because the photospreads attached to the State's response are clearly labeled A, B, or C and the last two are unlabeled.

identified by name or booking number on the lineups. There was one female lineup, and it contained a photograph of Defendant Turner.

After hearing arguments from the parties, the trial court noted that the State admitted to losing or misplacing the original lineups, that the "detective copies were for whatever reason in order to make a record here," and that it was agreed that no identification was made by Mr. Jennings or Mr. Reid while viewing the photographic lineups. The trial court indicated that though the evidence was "not inculpatory," it likewise did not possess potentially exculpatory value, and that it remained unconvinced that the Defendants could not receive a fair trial without the original set of photographic lineups. The trial court further commented that the situation might have been different if Mr. Jennings or Mr. Reid were now going to identify a defendant at trial, but such was not the case. In response to defense counsel's[8] argument that a possible unidentified suspect was included in the photographic lineups and that without the original lineups, the defense was unable to properly investigate, the trial court commented that the State was required to provide such information in the discovery materials about possible other suspects, but that such matters were not determinative of the motion to dismiss based upon photographic lineups in which no one was ever identified.

Relative to co-defendant Hawkins's cell phone, the trial court determined that the Defendants had failed to establish that a cell phone was seized by the police at the time of co-defendant Hawkins's arrest. The trial court denied the motion to dismiss, but stated that it would revisit the issue at trial if necessary.

Mr. Jennings was questioned about which lineups he was shown. The jury was informed that he did not identify anyone in the photographic lineups, though Defendant Thomas's photograph was in lineup A. Photographic lineups labeled A and B were admitted as exhibits at trial. At trial, the trial court saw no need to change its ruling based upon the evidence presented.

The Due Process Clause in the United States Constitution and its counterpart in the Tennessee Constitution both give every criminal defendant the right to a fair trial. U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8. "To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment." State v. Ferguson, 2 S.W.3d 912, 915 (Tenn. 1999) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)). This right imposes a duty on the State to produce all evidence that raises reasonable doubt as to the guilt of the defendant. Id. (citing United States v. Agurs, 427 U.S. 97, 110-11 (1976)). In

---

[8] Given the number of individuals involved in this case, we will refer collectively to the Defendants' lawyers as defense counsel unless specific reference to which attorney made a statement is needed to place an issue in its proper context.

Ferguson, our supreme court considered the course of action to take when allegedly exculpatory evidence is lost or destroyed before it is produced to the defense. See id. Ferguson held that, as an element of due process, fundamental fairness requires review of the entire record to ascertain the effect of the destroyed or missing evidence. Id. at 914. It adopted a balancing test for determining whether the defendant can have a trial that is fundamentally fair in the absence of that evidence. Id. at 917.

Under the Ferguson balancing test, the reviewing court first considers whether the State had a duty to preserve the missing evidence. 2 S.W.3d at 917. Subject to Rule 16 of the Tennessee Rules of Criminal Procedure and other applicable laws, including Brady, the State has a duty to preserve potentially exculpatory evidence that cannot be obtained by other reasonably available means. Id.; State v. Merriman, 410 S.W.3d 779, 792 (Tenn. 2013). The Ferguson Court explained:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

2 S.W.3d at 917 (quoting California v. Trombetta, 467 U.S. 479, 488-89 (1984)).

If the reviewing court concludes the State had a duty to preserve the evidence in question and failed to do so, then it must determine whether the loss or destruction of evidence violated the defendant's due process rights. Ferguson, 2 S.W.3d at 915-17. This determination is made by balancing the following factors: (1) the degree of negligence involved in the destruction or loss of the evidence; (2) the significance of the destroyed evidence, considered in light of its probative value and the reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to support the conviction. Id. at 917; Merriman, 410 S.W.3d at 785. If the reviewing court decides a trial without the evidence would be fundamentally unfair, the remedies may include dismissal of the charges or a jury instruction explaining how the jury is to consider the lost or destroyed evidence. Ferguson, 2 S.W.3d at 917. A trial court's application of the Ferguson factors involves a constitutional issue, and therefore, the proper standard of review on appeal concerning the fundamental fairness of a trial is de novo with no presumption of correctness. Merriman, 410 S.W.3d at 791, 797.

A. Photographic Lineups. In this case, the trial court noted that the State admitted to losing the evidence, but the trial court did not discuss the degree of negligence involved. We note that State had a duty to preserve the photographic lineups. See State v. Jerome

<u>Sanders</u>, 2016 WL 327277, No. W2014-00989-CCA-R3-CD, at *8 (Tenn. Crim. App. Jan. 27, 2016). We further observe that the trial court prohibited defense counsel from questioning any witnesses at the motion to dismiss hearing about why the lineups could not be located. Regardless, nothing in the record indicates that the police destroyed the evidence maliciously or intended to disadvantage the Defendants. Accordingly, the disposal of the lineups appears to be due to simple negligence. <u>See</u> <u>id.</u>

Relative to the significance of the evidence involved, the trial court noted that neither Mr. Jennings nor Mr. Reid made any identification when shown the various lineups, that Defendant Thomas's photograph was shown to Mr. Jennings in photographic lineup A, and that accordingly, the evidence was neither exculpatory nor inculpatory. The trial court also observed that the State had provided the Defendants with detective copies of five different lineups and that the State was required to provide information about other suspects the police pursued in discovery materials regardless of the identities of the individuals pictured in the lineups. The trial court commented that as for impeachment value, the situation might have been different if Mr. Jennings or Mr. Reid were now going to identify the Defendants at trial, but that such was not the case.

On the various copies of the photographic lineups in the record, the names of the male suspects pictured in lineups B and C and additional unlabeled lineup are identified. There is only one photographic lineup of females, and it is not clear if this lineup was ever shown to any of the witnesses. In his statement, Mr. Reid only indicated that he was shown one lineup labeled E.

At trial, it was clear that Mr. Jennings was shown photographic lineups A and B, and he was questioned about his inability to identify anyone in those lineups on cross-examination. Lineups A and B were admitted into evidence by the Defendants. Mr. Reid did not testify.

The Defendants offer nothing more than speculation. "The mere possibility of exculpatory content does not trigger a finding that the State failed in its general duty to preserve evidence under Ferguson." <u>State v. Ronnie D. Sims</u>, No. M2004-02491-CCA-R3-CD, 2005 WL 3132441, at *8 (Tenn. Crim. App. Nov. 22, 2005). The jury was presented with testimony from both Mr. Jennings and Detective Dandridge that Mr. Jennings was unable to identify anyone in photographic lineups A and B, and Detective Dandridge confirmed at trial that Defendant Thomas's photograph was included in lineup A. We agree with the trial court that the significance of the evidence was low in light of the fact that detective copies of the five different photographic lineups compiled in this case were provided to the Defendants prior to trial.

Finally, the sufficiency of the convicting evidence was unrelated to any identification made by Mr. Jennings, Mr. Reid, or the photographic lineups. Therefore, we

conclude that the Defendants' trial without the evidence was not fundamentally unfair and that the trial court properly denied the Defendants' motion to dismiss the indictment. See State v. Jerome Sanders, No. W2014-00989-CCA-R3-CD, 2016 WL 327277, at *6-8 (Tenn. Crim. App. Jan. 27, 2016) (holding that the trial court properly denied the defendant's motion to dismiss because, though the State had a duty to preserve the lineup, it was lost due to "simple human error[,]" and the value of the array was minimal given that the "the victim testified unequivocally that no one in the array was involved in the crime" and that "an exact duplicate of the array was available").

B. Co-defendant Hawkins's cell phone. In response to the motion to dismiss, the State explained that it had no record of any cell phone but that it had, nonetheless, "diligently searched" for co-defendant Hawkins's cell phone, including looking for a police evidence receipt. Though defense counsel asserted that they had been informed such a phone existed, the trial court found that the Defendants had failed to establish that a cell phone was seized by the police at the time of co-defendant Hawkins's arrest. We acknowledge that co-defendant Hawkins testified that he possessed a cell phone upon his arrest that was seized by police; however, credibility determinations are for the trial court. Because the Defendants failed to establish that the phone was lost or destroyed, analysis of the Ferguson factors is unnecessary. See State v. Buford Cornell Williams, No. M2019-01073-CCA-R3-CD, 2020 WL 3888315, at *3 (Tenn. Crim. App. July 10, 2020), perm. app. denied (Tenn. Oct. 7, 2020).

Even so, during discovery, the Defendants were provided with a portion of co-defendant Hawkins's cell phone records from September 24 to September 27, 2015, including location information and duration of calls, as well as information about text messages to and from the phone. The Defendants entered these records into evidence at trial during the cross-examination of co-defendant Hawkins. Moreover, the Defendants were aware of the contents of the KIK message co-defendant Hawkins sent to Ms. Dorris.

In addition, we agree with the State that the Defendants could have obtained more records from co-defendant Hawkins's cell phone by issuing a subpoena to the cell phone carrier. "Ferguson does not discharge a defendant's obligation to conduct expedient investigations and to secure relevant, material evidence whenever possible." State v. Michael Orlando Freeman, No. E2014-02054-CCA-R3-CD, 2016 WL 912160, at *14 (Tenn. Crim. App. Mar. 10, 2016). Without any further evidence, we are left to speculate what exculpatory evidence might have been produced if the cell phone had been examined.

The Defendants ask us to speculate that the cell phone might have contained additional information that would not have been apparent from the examination even if they had done so. Again, "[t]he mere possibility of exculpatory content does not trigger a finding that the State failed in its general duty to preserve evidence under Ferguson." Sims, 2005 WL 3132441, at *8. The Defendants have not established that their right to a fair

- 29 -

trial was violated absent the cell phone and are, therefore, not entitled to relief. See State v. Christopher Michael Ferrell, No. M2015-01011-CCA-R3-CD, 2016 WL 6819784, at *14-16 (Tenn. Crim. App. Nov. 18, 2016) (concluding that the State did not violate Ferguson by inadvertently destroying the contents of the victim's cell phone when the defendant could have obtained the cell records from the phone carrier).

### III. Alleged Brady Violation—Disclosure of Co-Defendant Hawkins's Proffer Sessions

The Defendants argue that the trial court erred by concluding that the State did not violate Brady v. Maryland, 373 U.S. 83, 87 (1963), when the State failed to disclose material portions of co-defendant Hawkins's proffer statements and that the omitted portions were both exculpatory and material. Specifically, they claim that co-defendant Hawkins stated for the first time during proffer sessions that Defendant Turner entered Anthony's residence and shot Ms. Springfield, which contradicted co-defendant Hawkins's formal statement to the MPD describing her as only a look-out. Both claim that had they known this information prior to trial, it would have impacted their chosen trial strategy. They request a new trial.

Defendant Thomas asserts that the proffer statements were favorable and material because if his attorneys had known of the statements, they would not have advised him to waive the apparent conflict of interest with Defendant Turner and his right to DNA testing of "some hairs" found in the victim Mr. Glover's hands. He further claims that the evidence was material because the State's evidence was "tenuous" and largely circumstantial. Defendant Turner also alleges "undisclosed use of perjured testimony by the [State] as well as undisclosed information following a specific request by the defense." She claims that co-defendant Hawkins's proffer statements were favorable because the statements were impeachment evidence.

Co-defendant Hawkins was interviewed by MPD officers on May 10, 2016, at 9:26 p.m.[9] After being advised of his rights, co-defendant Hawkins provided the following details surrounding the killings. Co-defendant Hawkins said that he knew the Defendants as fellow members from his "organization" and that he was present with the Defendants when these homicides occurred. When asked who was responsible for these murders, co-defendant Hawkins named Defendant Thomas, stating that he saw Defendant Thomas use a black Glock 17 weapon to shoot Anthony first, Ms. Springfield next, and Mr. Glover last. Co-defendant Hawkins indicated that Anthony was shot in the front of the house and that Mr. Glover and Ms. Springfield were shot in the back of the residence. According to co-defendant Hawkins, Defendant Thomas asked him to check and make sure the victims were dead, and while doing so, co-defendant Hawkins used a black 9mm handgun to shoot

---

[9] A copy of co-defendant Hawkins's statement was not admitted at trial. However, it was made an exhibit to the Defendants' renewed motion for judgment of acquittal, or in the alternative, a motion for new trial.

Anthony twice in the lower body. Co-defendant Hawkins said that before leaving, Defendant Thomas stole guns, a "long rifle and probably a .380," and marijuana from the residence.

Co-defendant Hawkins stated that after the murders, he ran behind the house through "the cut" and went home and that Defendant Thomas left in Defendant Turner's car. They later met at Zena Market so that co-defendant Hawkins could return the gun to Defendant Thomas. He indicated that the murders took place around 9:00 or 10:00 p.m.

Co-defendant Hawkins asserted that Anthony's murder was planned earlier that day at a meeting at Big Five's place in Binghampton; that thirteen people were present during this meeting, including Big Five, Little Solid, and Defendants Turner and Thomas; and that Defendant Thomas led this meeting. During the meeting, it was discussed that Anthony had to die because he failed to provide security for Mr. Martin, who had died as a result. According to co-defendant Hawkins, the plan was to walk in the residence and shoot the first person in sight.

When asked what was Defendant Turner's role in the murder, co-defendant Hawkins said that she was "[t]he look-out person" and explained that she was "[s]omething like security." Co-defendant Hawkins affirmed that Defendant Turner participated in the planning of Anthony's murder, and he confirmed that they arrived at Anthony's house in Defendant Turner's red, four-door Crown Victoria.

Prior to trial, the Defendants made a "Motion for Pretrial Disclosure of Specific Items of Material Evidence." Specifically, the Defendants requested "complete recitations of the contents of any oral and/or written statements" made by co-defendant Hawkins (1) that contradicted, or were otherwise inconsistent with, his formal statement made to officers of the MPD, or (2) that included significant details or facts omitted from his MPD statement. The Defendants stated that they were seeking disclosure of this information pursuant to Brady and were not relying on Rule 16 of the Tennessee Rules of Criminal Procedure.

On February 14, 2019, a hearing was held on the motion. At the hearing, defense counsel requested that the State be required to disclose the "two categories" of statements referenced in the motion. Defense counsel indicated that the State had already provided a "third category" of statements made by co-defendant Hawkins—those being statements that there were "inconsistent with themselves" between the various proffer sessions.

Defense counsel asserted that the requested oral statements qualified as Brady evidence because they served as impeachment evidence. Specifically, defense counsel argued, "Impeachment evidence is Brady evidence especially when as here the witness in question is someone whose testimony may be determinative of guilt or innocence." Stated

another way, defense counsel said, "[S]tatements that challenge the credibility of a key prosecution witness do fall within the <u>Brady</u> disclosure requirement."

The prosecutor then provided the court with some relevant facts to provide context for the issue, noting that defense counsel had already been provided the MPD statement. The prosecutor then stated that he had been involved in three proffer sessions with co-defendant Hawkins during which co-defendant Hawkins gave more details about what had happened that were "not part of" his original MPD statement. According to the prosecutor, in all three of those proffer sessions, co-defendant Hawkins had implicated himself and the Defendants, but he had not made any statements of an exculpatory nature. The prosecutor acknowledged that co-defendant Hawkins had made "contradictory" statements during those proffer sessions, and he affirmed that he had listed those three or four "inconsistencies" and provided them to defense counsel. Finally, the prosecutor recognized his continuing duty to disclose, and he indicated that if co-defendant Hawkins testified at trial to something different than the information relayed during the proffer sessions, he would make defense counsel aware of the substance of those statements.

The trial court noted that the State had provided the defense with any "material inconsistencies" to be used as impeachment evidence and that the State had acknowledged its continuing duty to disclose if co-defendant Hawkins testified differently at trial. Defense counsel clarified that it was not seeking disclosure of inconsistencies between the proffer sessions given that the State had already disclosed those, but was instead seeking any inconsistencies between the proffer sessions and the MPD statement. The trial court stated that it understood the Defendants' request but denied the motion, reasoning as follows:

> I don't think it can be produced. We're talking about an oral conversation and so I don't know how I could require the State to say they were forthcoming. And B, like I said when I prefaced my remarks after having read your motion, I do not find it to be inconsistent that a witness gives additional information in the future.

The trial court next remarked that it was aware, in certain instances, omissions could be deemed inconsistent statements—such being the case when "it is in response to a question where one could legitimately expect that to be the answer." The trial court explained,

> But that case is when a question is asked that would lead a person of common sense to realize that this is what they are asking me about and they don't respond. A witness says who was with you, who all was with you is asked and a witness says, me and Bill. Then later the witness testifies me, Bill, and Joe. Yes, I would rule that that would be an inconsistent statement.

- 32 -

The trial court then ordered the State to disclose co-defendant Hawkins's statements made under such circumstances:

> [I]f the witness is asked something in your proffer sessions that the answer to that should have included the original detail and did not give it and then later upon further . . . review shared this that they—that common sense would say they should have, I'm characterizing that as an inconsistent and if you know of those I would ask you to provide.

At the motion for new trial hearing, the Defendants argued that the State violated the Rules of Professional Conduct and Brady by not disclosing that in a proffer session, co-defendant Hawkins stated that Defendant Turner entered Anthony's residence during the offense and shot Ms. Springfield when such detail was not included co-defendant Hawkins's formal police statement to the MPD, wherein he described Defendant Turner's role as a look-out. The Defendants claimed that this was precisely the type of inconsistent statement that the trial court ordered the State to disclose during the February 14, 2019 hearing.

The trial court then asked Defendant Thomas's counsel what proof she had that the State knew that co-defendant Hawkins was going to testify at trial that Defendant Turner entered the house and shot Ms. Springfield. Counsel responded that at this point, she needed the State "to participate," to which the trial court said, "No, no, this is your motion. . . . I'm asking you what information or what evidence do you have that they had this information?" According to counsel for Defendant Thomas, she received post-trial information from Defendant Turner's counsel that "the State told [Defendant Turner's counsel] that from the beginning in his proffer sessions [co-defendant] Hawkins was saying that [Defendant] Turner shot Ms. Springfield." Counsel for Defendant Thomas asked for the State to be compelled to answer for the record if they knew of this information pretrial and failed to disclose it to Defendant Thomas, but the trial court ruled that it would not require the State do such.

Counsel for Defendant Thomas alleged that Defendant Thomas would have sought DNA testing of hairs found on the hands of the victim Mr. Glover if he had been aware of the substance of co-defendant Hawkins's proffer sessions. Additionally, counsel for Defendant Thomas alleged that she would not have advised Defendant Thomas to waive an apparent conflict of interest to representation by the public defender's office and that Defendant Thomas might have considered an opportunity to testify against Defendant Turner. Furthermore, according to counsel for Defendant Thomas, the defense would have pursued a different trial strategy, "one that might have challenged the notion that [Defendant] Thomas was criminally responsible for the actions of [Defendant] Turner" and co-defendant Hawkins in killing Ms. Springfield, rather than the chosen defense of mistaken identity.

- 33 -

Defendant Turner raised the same allegation in her motion. Counsel for Defendant Turner claimed that pretrial disclosure of co-defendant Hawkins's proffer statements would have affected Defendant Turner's decisions to seek testing of "certain evidence" or whether she would have testified at trial.

The State acknowledged that co-defendant Hawkins made inconsistent statements from one proffer session to the next and asserted that it had disclosed that information to the Defendants. The State memorialized "the four[ or] five inconsistent things" from co-defendant Hawkins's proffer sessions that conflicted with details provided in other proffer sessions and "turned those over to defense counsel well before trial." The State affirmed that in all proffer sessions co-defendant Hawkins implicated himself, Defendant Thomas, and Defendant Turner. Finally, the State asserted that after co-defendant Hawkins's trial testimony, it informed defense counsel of the "stuff that was inconsistent with details that [co-defendant Hawkins had] told [the State] in the proffer sessions that would weigh on his credibility."

The trial court determined that details from co-defendant Hawkins's proffer statements that were not included in his formal written statement did not constitute Brady material. The trial court reasoned,

> I don't find the defense's argument that [co-defendant] Hawkin[s's] testimony, when he adds some details that have not heretofor[e] been explained or written in his written statement constituted evidence in the possession of the [State] that they should have known and had a duty to provide to and the posse[s]sion of the State's that they should have been required to provide to the defense. . . . I don't accept that characterization of the fact. I think any time a witness testifies in an incumbent trial we often hear facts for the first time or—or additional facts or characterization.

The trial court also concluded that disclosure of these proffer statements would not have affected the Defendants' trial strategy.

A. Affidavit of co-defendant Hawkins's attorney. Defendant Thomas initially contends that this court should consider an affidavit from attorney Irwin Cantor and that the trial court erred in denying his motion to supplement the record with the affidavit. Mr. Cantor apparently represented co-defendant Hawkins, and "[t]he affidavit describe[d] in general terms some of the statements made by Mr. Cantor's client when discussing the events of the crime with Mr. Cantor and representatives of the District Attorney General's Office."

On September 26, 2019, after the Defendants both filed their timely notices of appeal in July, Defendant Thomas filed a motion to supplement the record with an affidavit

of Mr. Cantor and requested that the trial court suspend the requirements of Tennessee Rule of Appellate Procedure 24 pursuant to Tennessee Rule of Appellate Procedure 2. The motion indicated that the affidavit was attached, but one was not included in the technical record. The trial court denied Defendant Thomas's motion to supplement on October 22, 2019, and made a handwritten note on the order that it was doing so due to a "lack of jurisdiction."

Defendant Thomas filed a motion with this court on March 13, 2020, seeking to supplement the appellate record with the affidavit. In an order filed on April 1, 2020, we initially noted that the appellate record did not contain Mr. Cantor's affidavit[10] and that the trial court was correct that it lacked jurisdiction to suspend the rules of appellate procedure. However, because the trial court had the jurisdiction to determine the contents of the appellate record under Rule 2, and because it was unclear if the trial court ever ruled on the merits of Defendant Thomas's motion, we remanded for the trial court to rule on the "motion on the merits and determine whether the record should be supplemented with the affidavit." On May 27, 2020, the trial court again denied Defendant Thomas's motion to supplement the record with Mr. Cantor's affidavit, finding that such was not appropriate to include in the appellate record. The trial court noted that Mr. Cantor executed the affidavit on August 26, 2019, so Defendant Thomas sought to include "an item that did not exist until over two months after the denial of the motion for new trial." The trial court further commented, "Tennessee Rules of Appellate Procedure (Rule 14) governs post-judgment facts. This affidavit, if relevant, should be considered by means of a petition for a writ of error coram nobis or by permission through Rule 14."

"The jurisdiction of the Court of Criminal Appeals attaches upon the filing of the notice of appeal and, therefore, the trial court loses jurisdiction." State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996). "If any matter properly includable is omitted from the record, is improperly included, or is misstated therein, the record may be corrected or modified to conform to the truth." Tenn. R. App. P. 24(e). "Absent extraordinary circumstances, the determination of the trial court [regarding corrections and modifications of the record] is conclusive." Id. "Nothing in this rule shall be construed as empowering the parties or any court to add to or subtract from the record except insofar as may be necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(g).

The trial court properly denied Defendant Thomas's motion to supplement the record with Mr. Cantor's affidavit, which was created after this court assumed jurisdiction.

---

[10] Though the affidavit is still not a part of the record on appeal, co-defendant Hawkins's lawyer purportedly states therein that he was present during the proffer sessions with the State and confirmed that co-defendant Hawkins told the State during these proffer sessions that Defendant Turner went inside the house and shot Ms. Springfield.

Moreover, even if we were to consider a motion under Rule 14 of the Tennessee Rules of Appellate Procedure, the assertions by co-defendant Hawkins's lawyer do not constitute post-judgment "facts" capable of consideration by this court pursuant to Rule 14. See State v. Maurice Johnson, No. E2010-01142-CCA-R3-CD, 2011 WL 3586557, at *14 (Tenn. Crim. App. Jan. 28, 2011) (citing Tenn. R. App. P. 14, Advisory Comm'n Cmts. (stating that rule permits consideration of only those post-judgment facts "unrelated to the merits and not genuinely disputed" in order to "keep the record up to date" and "is not intended to permit a retrial in the appellate court"))) (denying a motion to consider as post-judgment facts "admissions" made by the district attorney in the State's Motion to Enter Nolle Prosequi in a co-defendant's case and allegedly calling into question the credibility of a detective). For these reasons, we affirm the trial court's decision and will not consider the affidavit because it is not properly included in the appellate. Nonetheless, we observe that even if we were to consider the affidavit, it would not change our decision for the reasons stated in the section that follows.

B. Brady material. In Brady v. Maryland, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. To prove a Brady violation, a defendant must demonstrate the following: (1) he requested the information (unless the evidence is obviously exculpatory, in which case the State is obligated to release such evidence regardless of whether or not it was requested); (2) the State suppressed the information; (3) the information was favorable to the defendant; and (4) the information was material. State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995).

"Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001) (citations omitted). Stated another way, evidence is favorable if it "'provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.'" Id. at 56-57 (quoting Commonwealth v. Ellison, 379 N.E.2d 560, 571 (Mass. 1978)). Moreover, the evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). The appellant bears the burden of proving a Brady violation by a preponderance of the evidence. Edgin, 902 S.W.2d at 390. "The lower court's findings of fact, such as whether the defendant requested the information or whether the state withheld the information, are reviewed on appeal de novo with a presumption that the findings are correct unless the evidence preponderates otherwise." Cauthern v. State, 145 S.W.3d 571 (Tenn. Crim. App. 2004). Conversely, "[t]he lower court's conclusions of law, however,

- 36 -

such as whether the information was favorable or material, are reviewed under a purely de novo standard with no presumption of correctness." Id.

It is clear that the Defendants requested the information in a written pretrial discovery motion, as well as orally at the hearing on the motion, and that the trial court ordered the State to disclose any inconsistencies between statements made by co-defendant Hawkins during the proffer sessions and his formal MPD statement. Specifically, after discussion on the motion, the trial court ordered as follows:

> [I]f the witness is asked something in your proffer sessions that the answer to that should have included the original detail and did not give it and then later upon further . . . review shared this that they—that common sense would say they should have, I'm characterizing that as an inconsistent [statement] and if you know of those I would ask you to provide.

Relative to whether the State suppressed the information, the trial court should have permitted defense counsel to solicit the information from the State regarding whether co-defendant Hawkins provided this detail during the proffer sessions. Information regarding details about these proffer sessions were uniquely within the State's domain. Because the trial court prohibited the State from commenting when requested to do so by defense counsel, we will accept as true, without specifically deciding such, that the State suppressed the information for the purposes of this opinion.[11]

Relative to whether that information was favorable to the Defendant, we find informative the Fourth Circuit's opinion in Spicer v. Roxbury Correctional Instructional, 194 F.3d 547 (4th Cir. 1999). In Spicer, an individual named Larry Brown, against whom narcotics charges were pending, met with his lawyer on various occasions, and told his lawyer the facts he knew concerning the defendant, whom Mr. Brown claimed had committed a serious assault. Id. at 551, 556-57. Mr. Brown then had his lawyer go to the prosecutor with this information, in an effort to bargain for leniency in his pending narcotics case. When the prosecutor later interviewed Mr. Brown, he, for the first time, presented additional incriminating information about his having seen the defendant flee from the scene of the crime (making him an eyewitness)—a key element in the case because of the highly contested identification testimony from the State's eye-witnesses. The defendant's counsel was never made aware of the inconsistency between the attorney's proffer and Mr. Brown's more expansive version of the facts.

Ultimately, the Fourth Circuit held that the evidence was favorable to the defendant and that the prosecutor was required to advise defense counsel of the significant potential

---

[11] Because we are accepting as true that the State suppressed the information, consideration of Mr. Cantor's affidavit is unnecessary.

discrepancy between what Mr. Brown's attorney indicated Mr. Brown knew and what Mr. Brown actually told the prosecutor. See Spicer, 194 F.3d at 556-57. The court reasoned that "[t]he impeachment quality of the evidence [was] clear" and that "[t]he discrepancy between [Mr.] Brown's testimony in court and his prior statements to his attorney would have provided [the defendant] with significant impeachment material aimed at the very heart of [Mr.] Brown's testimony—that he had been an eyewitness who could identify [the defendant] at the scene." Id.

Here, during co-defendant Hawkins's interview with the MPD, he was asked specifically about co-defendant Turner's role in the murder, to which he replied that she was "[t]he look-out person" and explained that she was "[s]omething like security." At trial, he stated that Defendant Turner came into the residence, asked if Ms. Springfield was dead, took co-defendant Hawkins's weapon, and then shot Ms. Springfield twice. We disagree with the trial court's characterization of this information as merely an elaboration by co-defendant Hawkins of details he provided in his MPD statement. This is clearly the type of inconsistent statement referenced by the trial court as being something the State was required to disclose to the Defendants—it is an original detail that should have been included in co-defendant Hawkins's answer to the question regarding Defendant Turner's role in these offenses.

Just as in Spicer, the impeachment quality of the evidence is clear. See also United States v. Sudikoff, 36 F. Supp. 2d 1196 (C.D. Cal. 1999) (holding that "to the extent the proffers [of an accomplice witness] and other information reveal that the witness's proposed testimony may have varied over time, they may reveal inconsistencies relevant to the accomplice witness's credibility and within the scope of Brady" as favorable evidence); State v. Jackson, 444 S.W.3d 554, 594-95 (Tenn. 2014) (holding that when a witness confessed in his third police statement that he was "rolling on XTC" on the night of the murder, it qualified as evidence favorable to the defense for purposes of the third Brady requirement). Accordingly, the inconsistent statement made by co-defendant Hawkins qualifies as favorable material because it "calls into question a material, although not indispensable, element of the prosecution's version of the events," as well as "challeng[ing] the credibility of a key prosecution witness." Johnson, 38 S.W.3d at 56-57. "[W]hen the prosecutor receives information that he, as an objectively reasonable prosecutor, should recognize as exculpatory or of impeachment value, he is under a duty to disclose it to the defendant if it is material." Spicer, 194 F.3d at 558.

Thus, the Defendants' Brady claim turns on the fourth element of whether the evidence was material. On this point, we find guidance from our supreme court in Jackson, 444 S.W.3d 554. In addressing this fourth Brady factor, our supreme court set forth the following legal principles:

The [United States] Supreme Court in Kyles discussed materiality at length and reiterated four key points. 514 U.S. at 34-37. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Id. at 434; see also Johnson, 38 S.W.3d at 58. Second, determining materiality is not the equivalent of determining the legal sufficiency of the evidence. Kyles, 514 U.S. at 434-35. Third, where a defendant establishes materiality, along with the other three elements necessary to show a Brady violation, the defendant also has inherently established that the violation was not harmless; thus, a separate harmless error analysis is unnecessary and inappropriate. Id. at 435; see also Johnson, 38 S.W.3d at 63; State v. Biggs, 218 S.W.3d 643, 660 (Tenn. Crim. App. 2006). Fourth, the materiality of suppressed evidence should be "considered collectively, not item by item." Kyles, 514 U.S. at 436. In this way, the prosecutor's responsibility is "to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached." Id. at 437.

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Id. at 434 (quoting Bagley, 473 U.S. at 678); see also Johnson, 38 S.W.3d at 58. Failing to disclose Brady materials may impair the adversary process in various ways, including causing the defense to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." Bagley, 473 U.S. at 682. A defendant seeking to establish materiality should call to the attention of the reviewing court any and all ways in which suppression of evidence impaired the adversary process and undermined confidence in the outcome of the proceeding.

Jackson, 444 S.W.3d at 595.

The State prosecuted the Defendants pursuant to two theories: first, that they were each active participants; or second, that they were criminally responsible for each other's actions. The State had provided the Defendants with inconsistent statements that co-

- 39 -

defendant Hawkins had made between the three proffer sessions, and the Defendants were provided with the original MPD statement. Moreover, the Defendants were able to cross-examine co-defendant Hawkins about his varying statements, and the discrepancies between his varying stories were brought to the attention of the jury, including the fact that he did not disclose to the MPD that Defendant Turner went inside the residence and shot Ms. Springfield. On cross-examination, co-defendant Hawkins agreed that there were inconsistencies between his testimony at trial and the statement that he gave to the MPD, such inconsistencies in the statement being that Anthony was able to walk Ralph to the store, that he rode to Anthony's in Defendant Turner's car, that Mr. Glover was the one who answered the door, that he shot Anthony "right at the end" of the encounter, that Defendant Thomas was the one who shot Ms. Springfield, that the murders took place around 9:00 or 10:00 p.m., that Defendant Turner never went inside the house, that he left the house by running around the back and walking home, that Defendant Thomas never called him afterward to meet and retrieve his 9mm handgun, and that thirteen gang members were in attendance for the Binghampton meeting. In addition, co-defendant Hawkins admitted that he was not completely truthful with the prosecutor when he spoke with him during their meetings.

The Defendants defended the charges based upon challenging the reliability of co-defendant Hawkins and alleging a case of mistaken identity. Prior to trial, the Defendants were aware that the State intended to utilize co-defendant Hawkins's testimony to inculpate them and place them both at the scene. Co-defendant Hawkins consistently implicated himself and the Defendants in his police statement and in the proffer sessions. In the MPD statement, co-defendant Hawkins affirmed that Defendant Turner participated in the planning of Anthony's murder. In addition, co-defendant Hawkins's unreliability was readily apparent to the jury, including the fact that he initially only described Defendant Turner's role as a look-out. We cannot see how having this information prior of trial would have changed the defense strategy. In fact, it provided only further evidence of co-defendant Hawkins's untrustworthiness.

The Defendants had the opportunity to change their trial strategies, request DNA testing, or decline to waive a possible conflict based on the State's disclosure of inconsistent details, yet they chose not to do so. We agree with the trial court that disclosure of the proffer statements would not have affected the Defendants' trial strategy or preparation of their cases. Accordingly, the State's failure to disclose favorable information in this case does not undermine our confidence in the outcome of this trial. See State v. Deaundra Donnell Smith, No. M2013-02247-CCA-R3-CD, 2015 WL 3540511, at *22 (Tenn. Crim. App. June 5, 2015) (noting the defense theories relied upon by the State at trial and holding that the fact that the defendant did not have the evidence pretrial did not undermine the court's confidence in the outcome). The Defendants have

not proven that the evidence the State suppressed was "material" and are, therefore, not entitled to relief.

*IV. Introduction of KIK Message Printout*

The Defendants argue that the trial court committed reversible error when it sua sponte in the jury's presence ruled that the printout of co-defendant Hawkins's KIK message was inappropriate evidence. According to the Defendants, the trial court, in so doing, interjected itself into the trial as an advocate and interfered with their right to present a defense. They claim that the trial court's ruling was an unconstitutional comment on the evidence. The State responds that any constitutional argument regarding admission of the printout was waived because the only discussion that occurred in the trial court pertained to hearsay and that plain error does not entitle the Defendants to relief.[12]

At trial, defense counsel showed co-defendant Hawkins a printout of a message he sent to Ms. Dorris via the KIK messenger app, and he identified the printout as an accurate reflection of his message. When defense counsel moved to admit the printout, the trial court interjected that the document was hearsay and that "the best evidence w[ould] be the testimony." Defense counsel observed that the State had not lodged an objection, to which the trial court responded, "I'm in charge of the evidence in this trial. I'm not bound by either side objecting or saying something. If I feel like the evidence is inappropriate, it's my duty to step in." After co-defendant Hawkins testified to the entire contents of the message to Ms. Dorris, defense counsel again moved to admit the printout, claiming that it was not hearsay because it was not being offered for the truth of the matter asserted. The trial court once again denied the request, stating that there was no "need to pass forward a piece of paper" when it had been testified to and that the "testimony [was] the evidence."

At the outset, we agree with the State that the Defendants did not make a contemporaneous objection to the trial court's handling of the printout based upon any constitutional basis. The trial court ruled that the printout was inadmissible hearsay and that co-defendant Hawkins's testimony was the best evidence. Defendant Thomas's counsel only replied by noting that the State had not lodged any objection. A defendant must object contemporaneously and identify the reason for his objection. See Tenn. R. Evid. 103(a)(1) (providing that timely objection for purposes of preserving the issue for

---

[12] The State also argues that Defendant Turner has waived review of her claim because she did seek to admit the evidence herself or join in Defendant Thomas's objection. However, because Defendant Thomas has been permitted to join in this issue on appeal, we decline to delve into an unnecessary discussion on waiver by a co-defendant. See State v. Thomas, 158 S.W.3d 361, 400-01 (Tenn. 2005); State v. Kenneth Fleming, No. W2016-01017-CCA-R3-CD, 2018 WL 1762208, at *11 (Tenn. Crim. App. Apr. 12, 2018); State v. Bashan Murchison, No. E2014-01250-CCA-R3-CD, 2016 WL 659844, at *18 (Tenn. Crim. App. Feb. 12, 2016 (all cases waiving the respective issues due to the failure to join in the co-defendant's objection but proceeding to address the issues on their merits).

appeal must state "the specific ground of objection if the specific ground was not apparent from the context").

Defendant Turner, in her reply brief, argues that no objection was necessary and cites to Tennessee Rules of Evidence 605, which states that the judge "presiding at the trial may not testify in that trial." Rule 605 further provides that no objection is needed to preserve the issue. However, this is not an instance where the trial judge testified or commented on facts not in evidence. See State v. Daniel Darrell Inman, No. E2005-01010-CCA-R3-CD, 2006 WL 3718235, at *13 (Tenn. Crim. App. Dec. 18, 2006). Accordingly, we do not believe that Rule 605 is applicable, and the Defendants failure to identify the constitutional grounds for the objection in this case constitutes waiver. See Tenn. R. App. P. 36(a).

This court is limited to reviewing the issue for plain error. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). In order for this court to find plain error,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)).

Of course, "judges in Tennessee are prohibited by our constitution from commenting upon the credibility of witnesses or upon the evidence in the case." State v. Suttles, 767 S.W.2d 403, 406 (Tenn. 1989); see also Tenn. Const. art. VI, § 9. Therefore, a fundamental right to a fair trial is implicated if a trial judge improperly comments on the evidence in a case. "In all cases the trial judge must be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." Suttles, 767 S.W.2d at 407. Despite these constraints, "not every comment on the evidence made by a judge is grounds for a new trial." Mercer v. Vanderbilt Univ., Inc., 134 S.W.3d 121, 134 (Tenn. 2004).

The trial judge has the inherent authority to sua sponte rule on the admissibility of evidence, without an objection being raised. Lee Kraft v. Ezo-Goten, USA, Inc., No. M2001-03137-COA-R3-CV, 2002 WL 31769242, at *4 n.2 (Tenn. Ct. App. Dec. 11, 2002). Furthermore, the trial court determined that the printout was "inappropriate" evidence, inferring that it was inadmissible hearsay. Ruling that something is hearsay, regardless of the propriety of the ruling, is not an improper comment on the evidence. The use of the specific word "inappropriate" does not somehow transform a hearsay ruling into improper commentary. Moreover, the substance of the message was admitted through defense counsel's questioning of co-defendant Hawkins, and co-defendant Hawkins acknowledged sending it. A printout of such would have served only as a demonstrative exhibit and to confirm such testimony. Accordingly, we conclude that no clear and unequivocal rule of law has been breached, that a substantial right of the accused was not adversely affected, and that consideration of the error is not necessary to do substantial justice.

*V. Jury Instructions*

Finally, the Defendants argue that the trial court erred in its instructions by utilizing the language "or either of them" throughout the instructions. First, the Defendants contend that the trial court abused its discretion by utilizing the "or either of them" language in the jury instructions that set out the elements of the charged offense first-degree premeditated murder, as well as the lesser-included offenses, because doing so shifted the burden of proof onto them to establish that they were not guilty. The Defendants also claim that the trial court erred by including the "or either of them" language in the presumption of innocence instruction because it "permitted the jury to set aside the presumption of innocence with respect to [the Defendants]" and confused the jury. Lastly, they argue that the trial court abused its discretion by including the "or either of them" language in the criminal responsibility instruction because the instruction impermissibly suggested guilt for first-degree premeditated murder merely by association with the other. The State responds that the trial court properly included the "or either of them" language in the jury instructions when Tennessee courts have used similar language in cases with multiple defendants and the thorough and clear jury instructions, when considered as a whole, could not have confused or misled the jury. We agree with the State.

During a jury-out hearing where the parties discussed the proposed jury instructions, defense counsel objected to the language "or either of them" that ran "throughout" the instructions because "it appear[ed] to give the jury the option of doing something to both if it f[ound] that that [was] applicable only to one." By way of example, defense counsel noted the instruction for first-degree premediated murder: "'That the defendant, or either of them, unlawfully killed the alleged victim.' That makes it sound as if . . . the State has proved, beyond a reasonable doubt, that [Defendant] Thomas unlawfully killed the alleged

- 43 -

victim, then they've established that element for [Defendant] Turner." The trial court stated that it shared defense counsel's concern "about the language of the charge to a certain degree," but commented that the jury would consider the first-degree premeditated murder instruction in totality with all the other instructions, including an instruction that "while being tried together, these are separate trials and the evidence, . . . should be applied only to the defendant that it applies to, if any." In addition, the trial court noted that it intended to submit separate verdict sheets for each defendant to the jury and that the jury would be instructed that "while they're being tried together, the verdicts have to be separate as to each." The trial court offered to use a different instruction that was clearer or issue a special instruction if one was provided by the Defendants, but the Defendants declined this request. Absent any suggestions, the trial court stated that it was "comfortable with the instructions as a whole."

Regarding the elements of first-degree murder, the trial court instructed, in relevant part,

Any person who commits the offense of first-degree murder is guilty of a crime. For you to find the defendants, or either of them, guilty of this offense, the State must have proven, beyond a reasonable doubt, the existence of the following essential elements: That the defendants, or either of them, unlawfully killed the alleged victim; two, that the defendants, or either of them, acted intentionally.

Similar "or either of them" language was included in each instruction on the lesser-included offenses.

Thereafter, the trial court gave an instruction on the presumption of innocence:

The law presumes that the defendants, or either of them, are innocent of the charges against either of them. This presumption remains with the defendants, or either of them, throughout every stage of the trial and it is not overcome unless, from all the evidence in the case, you are convinced, beyond a reasonable doubt, that the defendants, or either of them, are guilty.

Also, the criminal responsibility instruction, in pertinent part, stated,

The defendants, or either of them, are criminally responsible as parties to the offenses of murder, first-degree, premeditated killing and any lesser included offenses if the offenses were committed by the defendant's own conduct, by the conduct of another for which the defendants, or either of them, are criminally responsible, or by both.

- 44 -

The remainder of the instruction closely tracked Tennessee Code Annotated sections 39-11-401 and -402.

A defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); see State v. Leath, 461 S.W.3d 73, 105 (Tenn. Crim. App. 2013). When reviewing jury instructions on appeal to determine whether they are erroneous, this court must "review the charge in its entirety and read it as a whole." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Id. Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. Carpenter v. State, 126 S.W.3d 879, 892 (Tenn. 2004).

The Defendants' argument includes no authorities agreeing with their interpretation of the "or either of them" language. In fact, instructions for second-degree murder and criminal responsibility using the "or either of them" language have been cited with approval by this court. See Rodrick Johnson v. State, No. M2002-01212-CCA-R3-PC, 2003 WL 22038784, at *5-6 (Tenn. Crim. App. Sept. 2, 2003). While the Defendants acknowledge the trial court issued an instruction regarding multiple defendants, they contend that this was insufficient to cure the jury instructions that were permeated with the "or either of them" language. However, we respectfully disagree with this argument.

The trial court here informed the jury on several occasions to consider the guilt or innocence of each defendant individually. At the outset of the jury instructions, the trial court charged the jury as follows:

> Members of the jury, these two defendants are being tried at one time, but it must be remembered by you, the jury, at all times that even though the defendants are being tried together, that they are separate and distinct and must be treated as such by the jury. When the word defendant is used in these instructions, it applies equally to [Defendant] Thomas and [Defendant] Turner unless otherwise stated.

After the lesser-included offense instructions, the trial court instructed on multiple defendants. Specifically, the court instructed as follows:

> You should give separate consideration to each defendant. Each is entitled to have his or her case decided on the evidence and the law which is applicable to that particular defendant. Any evidence which was limited to a particular defendant should not be considered by you as evidence to any other defendant. You can acquit both, or convict both, or you can acquit one

and convict the other. If you cannot agree upon a verdict as to both defendants but do agree upon a verdict as to one of them, you must render a verdict as to the one upon which you agree. <u>When the phrase, "or either of them" is used in these instructions, it does not mean that the proof as to one defendant automatically applies to the other. It is designed to allow one set of instructions to apply to your separate decision as to each defendant.</u>

(Emphasis added). The emphasized language is not included in the pattern instruction, <u>see</u> Tennessee Pattern Instructions—Criminal 41.04, and trial court indicated at the motion for new trial hearing that it added such language to assuage the Defendants' concerns.

Moreover, the trial court's burden of proof instruction clearly charged the jury that the burden of proof never shifted away from the State and that neither defendant was required to prove his or her innocence:

The State has the burden of proving the guilt of the defendants, or either of them, beyond a reasonable doubt, and this burden never shifts, but remains on the State throughout the trial of the case. The defendants, or either of them, are not required to prove their innocence. If the State proves the guilt of one defendant, beyond a reasonable doubt, it does not automatically mean the case has been proven, beyond a reasonable doubt, as to the other.

We think these specific instructions, along with the burden of proof instruction, clearly provided the jury with the opportunity to convict or acquit the Defendants individually. The jury charge as a whole did not fail to fairly submit the legal issues or mislead the jury as to the applicable law. This claim does not entitle the Defendants to relief.

<u>CONCLUSION</u>

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

- 46 -